## Trustees of Tufts University *vs.* Commercial Union Insurance Company & another.[1]

Middlesex. April 8, 1993. - July 16, 1993.

Present: Liacos, C.J., Wilkins, Lynch, O'Connor, & Greaney, JJ.

*Insurance*, Comprehensive liability insurance, Defense of proceedings against insured, Coverage, Construction of policy. *Contract*, Insurance, Construction of contract. *Hazardous Materials*.

Two insurers under policies of comprehensive general liability insurance had a duty to defend their insured on a property damage claim by the buyer of certain land on which the insured's wholly owned subsidiary had operated a wood treatment plant during the policy period, where the policies, as interpreted by this court, did not require that the plaintiff in the underlying action have a property interest in the land during the policy period, but required only that the damage, contamination allegedly resulting from release of hazardous material, itself occur during that time. [847-852]

Provisions in two policies of comprehensive general liability insurance excluding coverage for damage to "property owned or occupied by . . . the insured" did not preclude coverage for the cost of removing pollutants from land formerly owned by a wholly owned subsidiary of the insured. [852-853]

Where a policy of comprehensive general liability insurance provided that the insurer had a duty to defend its insured where there was an "occurrence" that resulted during the policy period in "property damage," the insurer's duty existed irrespective of whether the damage, contamination resulting from the release of hazardous material, was discovered or manifested during the policy period. [853-855]

Summary judgment in a civil action could not be sustained on the basis of an argument that raised questions of material fact. [855]

There was no merit to an insurer's contention that it had no duty to defend its insured under a policy of comprehensive general liability insurance because the property damage in question did not result from hazards scheduled in its policies. [855-856]

[1]St. Paul Fire and Marine Insurance Company.

CIVIL ACTION commenced in the Superior Court Department on January 23, 1991.

The case was heard by *Charles J. Hely*, J., on a motion for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Stephen J. Brake* (*Daniel J. Gleason, Joseph G. Blute & Julie A. Trachten* with him) for the plaintiff.

*Michael F. Aylward* for St. Paul Fire and Marine Insurance Company.

*Peter G. Hermes* (*Robert A. McCall & Kevin J. O'Connor* with him) for Commercial Union Insurance Company.

*David M. Jones, John M. Edwards, James E. McGuire & Diane E. Kenty*, for Bose Corporation & others, amici curiae, submitted a brief.

*Thomas W. Brunner, Laura A. Foggan, Robert B. Bell & William G. Miller*, of the District of Columbia, & *Michael R. Coppock*, for Insurance Environmental Litigation Association, amicus curiae, submitted a brief.

LYNCH, J. Trustees of Tufts University (Tufts) commenced this action for declaratory relief against the defendant insurers, Commercial Union Insurance Company (Commercial Union) and St. Paul Fire & Marine Insurance Company (St. Paul), seeking a declaration that the insurers were under a duty to defend Tufts in a liability claim. The insurers moved for summary judgment. A judge in the Superior Court granted the insurers' motion, and Tufts appealed. We granted the Tufts' application for direct appellate review.

The following facts are not in dispute. Tufts purchased liability insurance coverage from both insurers. The policy periods on the Commercial Union policy extended from July 1, 1968, to November 7, 1972. The policy periods on the St. Paul policy covered November 7, 1972, through July 1, 1975.

In June, 1977, the Jacksonville Electric Authority (Jacksonville) acquired by condemnation land in Florida that had once been owned by a subsidiary of Tufts. In April, 1989, Jacksonville filed suit in the United States District Court for the Middle District of Florida against Tufts and two other

defendants, to recover cleanup and response costs for environmental damage to the land under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended, 42 U.S.C. §§ 9601 et seq. (1988). The complaint alleged that: (1) the Eppinger and Russell Company (E & R), The Bernuth Corporation, and Tufts owned or operated a creosote wood preservation facility on the subject parcel until the early 1960's; (2) E & R was a wholly owned subsidiary of Tufts from 1925 until 1942; (3) while E & R, Bernuth and Tufts owned or operated the facility, arsenic creosote, carbazole, and phenanthrene were released during transfer, storage, and preservation treatment operations on the parcel; (4) Jacksonville had incurred and will incur costs for remedial actions necessary to treat and cap the hazardous substances released on the site; (5) the actions taken are in response to directives from the Florida Department of Environmental Regulation pursuant to a consent order, a copy of which was attached to the complaint. The consent order stated that tests indicated contamination of soil and ground water, and that Jacksonville was attempting to eliminate discharges into the St. Johns River.[2]

Tufts moved for summary judgment on Jacksonville's complaint and a United States District Court judge granted the motion on the basis that Tufts was not an "owner and/or operator" of the site under CERCLA. *Jacksonville Elec. Auth.* v. *Eppinger & Russell Co.*, 776 F. Supp. 1542 (M.D. Fla. 1991), and Jacksonville appealed. That appeal is currently pending in the United States Court of Appeals for the Eleventh Circuit.

In May, 1989, Tufts demanded that the insurers defend and indemnify it in connection with the Jacksonville action. When the insurers refused, Tufts filed this action in Superior Court in Middlesex County seeking a declaration of its rights under the policies. The Superior Court judge ruled: "The in-

---

[2]The complaint does not specify the precise dates of release, contamination, or migration of the pollutants but can be reasonably read as alleging such damage throughout the time periods encompassed by the complaint.

surers have no duty to defend in this case because the claimant Jacksonville did not become the owner of the property until June, 1977, and thus could not possibly have sustained property damage in relation to this property until two years after the end of the latest policy period." We reverse.

1. A liability insurer has the duty to defend third-party actions against an insured if the allegations in the third-party complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms.[3] *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc.*, 412 Mass. 330, 331-332 (1992). *Continental Casualty Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 146-147 (1984). *Sterilite Corp.* v. *Continental Casualty Co.*, 17 Mass. App. Ct. 316, 318 (1983). Under the policy terms the insurers promised to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . *property damage* . . . caused by an *occurrence*, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . ." (emphasis added).[4] In the Commercial Union policy the term "occurrence" is defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property

---

[3]"Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." *Continental Casualty Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 147 (1984), quoting *Sterilite Corp.* v. *Continental Casualty Co.*, 17 Mass. App. Ct. 316, 318 (1983).

[4]The policy language quoted is taken from Commercial Union's comprehensive general liability policies. St. Paul's policies are denominated as "[c]omprehensive [h]ospital [l]iability" policies. However, the St. Paul policies contain property damage liability endorsements that require the insurer to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by [occurrence]." We reject St. Paul's argument that this language does not provide comprehensive general liability coverage.

damage, neither expected nor intended from the standpoint of the insured." The policies define "property damage" as "injury to or destruction of tangible property" during the policy period.[5] The policies contain provisions excluding coverage for "property damage to property owned or occupied by . . . the insured," but do not contain pollution exclusion clauses.

Reading these policy provisions together, we conclude that the allegations in the Jacksonville complaint state a claim covered by the policy terms. In the United States District Court complaint, Jacksonville requests reimbursement for the cost of cleaning up contamination on the site caused by release of hazardous substances during the time Tufts owned or operated the site. The "occurrence" is the "injurious exposure" to the hazardous material during the policy periods. The "property damage" is the continued contamination of soil and groundwater on the site during the policy periods caused by the release of the hazardous material. *Hazen Paper Co.* v. *United States Fidelity and Guar. Co.*, 407 Mass. 689, 698 (1990). The plain language of the policy terms, therefore, indicates that the insurers had a duty to defend Tufts in these claims.

The insurers argue that the proper inquiry under these policies is not whether property damage occurred during the policy period, but whether the entity making the claim sustained harm during the policy period. *Hoppy's Oil Serv., Inc.* v. *Insurance Co. of N. Am.*, 783 F. Supp. 1505, 1508 (D. Mass. 1992). Thus, they argue that the judge was correct in ruling that, since Jacksonville did not acquire the property until 1977, it could not have sustained harm until after the last policy period in 1975. We disagree with this interpretation of the policies. The policy language does not require that Jacksonville have a property interest in the contaminated property during the policy period, but only that the property damage itself occur during that time. Had the insurers in-

---

[5]While the language quoted is taken from both policies, the St. Paul policy also requires that the damage occur "during the policy period."

tended to exclude coverage whenever the underlying plaintiff did not own the property at the time of the occurrence, the insurers could have expressed such an exclusion. See *Garriott Crop Dusting Co.* v. *Superior Court of Kern County*, 221 Cal. App. 3d 783, 791 (1990). Even assuming that the policies are susceptible to the interpretation of the insurers, where "there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it." *Hazen Paper Co.* v. *United States Fidelity & Guar. Co., supra* at 700.

In construing this policy, it is also appropriate "to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Id.* We conclude that a reasonable policyholder, reading this policy language, would expect coverage in these circumstances. There is no restriction in the language of the policy requiring that the claimant possess an ownership interest in the property at the time the damage occurred. "We read the policy as written. We are not free to revise it or change the order of the words." *Continental Casualty Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 147 (1984). This court has, in the past, refused narrowly to construe policy terms which would limit or defeat "any coverage fairly intended to be given by a policy described by the insurer in such broad terms ('Comprehensive General Liability Policy') as was this policy." *Vappi & Co.* v. *Aetna Casualty & Sur. Co.*, 348 Mass. 427, 432 (1965).

The judge and the insurers rely on *Hoppy's Oil Serv., Inc.* v. *Insurance Co. of N. Am.*, 783 F. Supp. 1505, 1508 (D. Mass. 1992) ("Under 'occurrence' coverage, as commonly construed and applied in Massachusetts . . . and other states as well, an entity making a tort claim against the insured must sustain harm within the period of the policy in order to assert a claim to which the insurance applies"). In *Hoppy's Oil*, the court held that an insurer had no duty to defend an insured where the plaintiff in the underlying action did not acquire an interest in the property allegedly damaged by the insured until after the period of the policy. *Hoppy's Oil*

*Serv., Inc.* v. *Insurance Co. of N. Am., supra* at 1508. The United States District Court based its decision on a Massachusetts case, *Continental Casualty Co.* v. *Gilbane Bldg. Co., supra.* See *Hoppy's Oil Serv., supra* at 1508-1509 ("Although the Massachusetts Supreme Judicial Court has not yet had occasion to consider this precise issue, see *Lumbermens Mut. Casualty Co.* v. *Belleville Indus., Inc.,* 407 Mass. 675 . . . [1990], this conclusion is consistent with relevant Massachusetts precedent. See *Continental Casualty Co.* v. *Gilbane Bldg. Co.,* 391 Mass. 143 . . . [1984]"). We, however, distinguish *Gilbane, supra,* and decline to follow the rule in *Hoppy's Oil Serv., supra,* in this case.

*Gilbane, supra,* was a declaratory judgment action brought by the insurer of two construction firms alleged to be responsible to the John Hancock Mutual Life Insurance Company for faulty design of the John Hancock Tower that led to the failure of glass window panels and resulting property damage. *Id.* at 144-146. The insurer contended that a "[c]are, custody, or control exclusion" in the comprehensive general liability policy issued to the construction companies justified its disclaimer of coverage. Under that exclusion, there was no coverage for property "*being installed, erected or worked upon*" by the companies (emphasis in original). *Id.* at 151. The insurer argued that the failure of the window panels constituted a single occurrence that commenced when the companies were still working on them, and therefore that the damage was not within the policy. *Id.* The court rejected the argument, stating: "The time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." *Id.* at 152.

It is in this context that the rule followed in *Gilbane, supra,* must be read. The underlying claimant in *Gilbane, supra,* owned the damaged property at all relevant times. The court, therefore, could refer to damage to the "complaining party" instead of damage to the "property." *Garriott Crop Dusting Co.* v. *Superior Court of Kern County,* 221 Cal. App. 3d 783, 793 (1990). But by doing so, the court was

distinguishing between a causative act and the injurious result of that act. *Id.·* at 795. Applied here *Gilbane, supra,* stands for the proposition that the event giving rise to coverage under an occurrence-based policy is the happening of the actual property damage, and not the causative act. *Garriott Crop Dusting Co., supra* at 793-794. Moreover, the court in *Gilbane, supra,* did not require that the complaining party own the property at the time the damage occurs.[6]

The California Court of Appeals distinguished the general rule of *Gilbane, supra,* in similar fashion. *Garriott Crop Dusting Co., supra* at 793-795. See *Remmer v. Glens Falls Indem. Co.,* 140 Cal. App. 2d 84, 88 (1956) ("The general rule is that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged"). The *Garriott* court stated:

> "In the midst of this rush to adopt the 'general rule' of *Remmer,* it must be remembered that the rule is just that: a general rule. It is not universal; it is not without exception. . . . [Here, the insured] is now being sued for property damage (physical injury to tangible property) which may have commenced during one of the last two . . . policy periods — precisely what the policies say they cover. Use of the *Remmer* rule to impose a prerequisite to coverage not expressed in the policies (i.e., that the eventual claimant had to own the damaged property

---

[6]The court in *Garriott Crop Dusting Co. v. Superior Court of Kerns County,* 221 Cal. App. 3d 783, 791 (1990), reviewing similar policy language, stated: "[U]nder the terms of the insurance policies . . . the 'event triggering coverage is one that causes "physical injury to or destruction of tangible property" . . . during the policy period. Nowhere do the policies say to whom that property must belong, save that it must not belong to the insured. In other words, the policies themselves do not expressly require that the eventual claimant own the property at the time the property is damaged for coverage to ensue; they merely require that the damage, the "physical injury to . . . tangible property," ' take place during the policy period."

during the policy period) would be contrary to every fundamental rule of insurance policy construction." (Citation omitted.)

*Garriott Crop Dusting Co., supra* at 794-795.

There are additional reasons that support our interpretation. If Tufts were sued under CERCLA or G. L. c. 21E for allegedly contaminating two separate properties — one owned by the same party throughout the period during which the property damage occurred, and the other recently sold to a new owner — under the insurer's interpretation coverage would exist for the former claim but not the latter. See *Garriott Crop Dusting Co., supra* at 795 ("We do not see any reason why the existence of coverage *vel non* should turn on fortuitous events or conditions wholly outside the insured's control"). Moreover, since CERCLA and the Massachusetts equivalent, G. L. c. 21E, attempt to place the ultimate responsibility for cleaning up hazardous waste on those entities responsible for the contamination, see 42 U.S.C. § 9607; G. L. c. 21E, § 5 (*a*), we think it entirely logical that the insurer whose policies are in effect during the time that the property damage is alleged to have occurred be required to defend the insured. See *Jacksonville Elec. Auth.* v. *Eppinger & Russell Co.*, 776 F. Supp. 1542, 1545 (M.D. Fla. 1991), citing *Florida Power & Light Co.* v. *Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990).

2. The "owned property exclusion" in each policy, which prevents an insured from obtaining coverage for damage or injury to "property owned or occupied by or rented to the insured," does not preclude our result. The facts alleged in the complaint and those facts known by the insurers do not establish that Tufts owned the contaminated property. *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.*, 406 Mass. 7, 10-11 (1989). The underlying complaint does allege that Tufts "owned and/or operated" a facility on the Jacksonville site. However, it also alleged that E & R was a wholly owned subsidiary of Tufts, which ordinarily would mean that Tufts owned stock in E & R, and E & R

owned the property. *Jacksonville Elec. Auth.* v. *Eppinger & Russell Co.*, *supra* at 1544. Indeed, the court in the underlying Jacksonville action stated: "It is undisputed that [Tufts] never actually owned the facility in question. [E & R] owned the facility, while [Tufts] was the parent company of [E & R]. 'The property of the corporation is its property, and not that of the stockholders, as owners.' " *Id.* at 1545.[7]

3. Commercial Union also argues it had no duty to defend Tufts because the property damage to the Jacksonville site did not manifest itself until after its last policy period. Commercial Union, however, again ignores the language of the policy itself. The policy requires a duty to defend where there is an "occurrence," including injurious exposure to conditions, that results, during the policy period in "property damage," a term defined as injury to, or destruction of, property. Nothing in the language of the policies requires that the claimed property damage be discovered or manifested during the policy period. The inquiry instead, is whether the property damage, as defined in the policies, "occurred" within the policy period and within the meaning of the word "occurrence." *Harford County* v. *Harford Mut. Ins. Co.*, 327 Md. 418, 434 (1992). Indeed, the very nature of an "occurrence" as opposed to a "claims-made" policy is to provide coverage for property damage that occurred during the policy period whenever that liability is imposed. K.S. Abraham, Environmental Liability Insurance Law 95 (1991).

We have already said: "The contamination of soil and groundwater by the release of hazardous material involves property damage." *Hazen Paper Co.* v. *United States Fidelity and Guar. Co.*, 407 Mass. 689, 698 (1990). The burden of showing that property damage occurred within the coverage of the policies is on the insured. *Harford County* v. *Harford Mut. Ins. Co.*, *supra* at 436. We, therefore, conclude that coverage may be triggered before discovery or

---

[7]That court also concluded that "no genuine issue of material fact exists which would justify piercing the corporate veil to hold Tufts liable as an owner under CERCLA." *Jacksonville Elec. Auth.* v. *Eppinger & Russell Co.*, 776 F. Supp. 1542, 1546 (M.D. Fla. 1991).

manifestation of the damage.[8] See *New Castle County* v. *Continental Casualty Co.*, 725 F. Supp. 800, 812 (D. Del. 1989), rev'd on other grounds, 933 F.2d 1162 (3d Cir. 1991) (applying continuous trigger to environmental damage from spread of leachate); *United States Fidelity & Guar. Co.* v. *Thomas Solvent Co.*, 683 F. Supp. 1139, 1153, 1162 (W.D.Mich. 1988) (rejecting manifestation trigger and holding occurrence may have happened after each exposure of the environment to a pollutant); *Harford County* v. *Harford Mut. Ins. Co.*, *supra* at 434-436 (rejecting manifestation theory and holding that policies in effect when property damage occurred are triggered).

In deciding this appeal we need not reach the question whether another trigger is appropriate; we need only decide that the manifestation trigger is inappropriate.[9] See *Lumbermens Mut. Casualty Co.* v. *Belleville Indus., Inc.*, 407 Mass. 675, 687 (1990); *Harford County* v. *Harford Mut. Ins. Co.*, *supra* at 436. Any of the other trigger theories would raise a duty to defend, but a precise determination of which we should adopt requires additional findings on the nature of the

---

[8]Only a few courts have adopted the "manifestation trigger" urged by Commercial Union. Those that did adopt the trigger reasoned that the bodily injury or property damage at issue does not occur until manifested. K.S. Abraham, Environmental Liability Insurance Law 97 (1991). See *Eagle-Picher Indus., Inc.* v. *Liberty Mut. Ins. Co.*, 682 F.2d 12, 25 (1st Cir. 1982), cert. denied, 460 U.S. 1028 (1983) (manifestation trigger adopted in asbestosis case, but emphasizing that disease "results" under the policies when it becomes clinically evident). See also *Eagle-Picher Indus., Inc.* v. *Liberty Mut. Ins. Co.*, 829 F.2d 227, 250 (1st Cir. 1987) (to determine when asbestosis was "reasonably capable of diagnosis," trigger is six years before actual diagnosis).

[9]Apart from the "manifestation trigger," the three most common "trigger theories" include: the exposure trigger (policies in effect during years claimant's property tortiously exposed to hazardous material triggered), the continuous (or multiple) trigger (property damage occurs during each year from the time of first hazardous exposure through manifestation), and the injury-in-fact (or actual injury) trigger (requires inquiry into when property damage actually occurred). S.M. Popik, Introduction to the CGL Policy Form: Occurrence Versus Claims-Made Policy Forms in Comprehensive General Liability Policies (P.L.I. Commercial Law & Proc. Course Handbook No. A-658 1993). K.S. Abraham, Environmental Liability Insurance Law 96-98 (1991).

injury. See *Belleville Indus., supra,* quoting *In re Acushnet River & New Bedford Harbor,* 725 F. Supp. 1264, 1276 (D. Mass. 1989) (crucial factor in determining when injury occurs for purposes of insurance coverage is nature of injury).[10]

We note that different triggers may be applied to different types of injuries and property damage.[11] See, e.g., *Trizec Properties, Inc.* v. *Biltmore Constr. Co.,* 767 F.2d 810, 813 (11th Cir. 1985) (manifestation trigger rejected in negligence and breach of contract action in construction case); *American Home Prods. Corp.* v. *Liberty Mut. Ins. Co.,* 748 F.2d 760, 764 (2d Cir. 1984) (injury-in-fact trigger adopted in bodily injury case); *Insurance Co. of N. Am.* v. *Forty-Eight Insulations, Inc.,* 657 F.2d 814 (6th Cir. 1981) (exposure, rather than manifestation trigger adopted in asbestos case); *Triangle Publications* v. *Liberty Mut. Ins. Co.,* 703 F. Supp. 367, 371 (E.D. Pa. 1989) (manifestation trigger rejected in environmental damage case; insured must prove actual damage during policy period).

4. Commercial Union argues that its policies are not triggered because the property damage at the site was a loss in progress at the inception of its policy periods. Their argument, however, raises questions of fact as to when property damage at the site occurred and, therefore, cannot be a basis for sustaining summary judgment.

5. Commercial Union also contends it has no duty to defend because E & R's operations were not scheduled hazards in its policies. The policy which purports to be com-

---

[10]We note that we are concerned here only with the insurers' duty to provide or pay for a defense to the insured, and not with their duty to indemnify for damages from a final judgment. "[A]n insurance company's duty to defend is broader than its duty to indemnify. An insurer must indemnify its insured when a judgment within its policy coverage is rendered against the insured. The duty to defend, however, is antecedent to, and independent of, the duty to indemnify." *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.,* 406 Mass. 7, 10 (1989).

[11]Indeed, one commentator has noted that, given variations in the injury processes associated with different kinds of environmental harms, different triggers for environmental harms may be appropriate. K.S. Abraham, Environmental Liability Insurance Law 105 (1991).

prehensive general liability insurance provides that "coverages" includes "property damage liability" and that a specific premium was charged for the coverage. Item 3 of the declarations page states: "The insurance afforded is only with respect to such of the following coverages as are indicated by specific premium charge or charges." Nowhere does the policy unambiguously provide that coverage is limited to the specific hazards listed in the schedule. Thus, the very reading of the policy now urged by Commercial Union could not properly be the basis of summary judgment in its favor.

A related issue is Commercial Union's argument that it has no duty to defend because Tufts' failure to identify E & R as a scheduled hazard increased Commercial Union's risk of loss. The policy does not seek to identify the ownership of stock or clearly require the insured to disclose property it may have controlled in the past as the result of its ownership of corporate stock. Commercial Union argues that at the very least these issues should be resolved by further proceedings in the Superior Court. We agree.

6. Finally, we decline to accept Commercial Union's assertion that we should reject Tufts' arguments as not based on the record before the Superior Court. Our decision is not based on Tufts' characterization of the policies as "standard form" and "classic contracts of adhesion."

*Judgment reversed.*