White, J.
INTRODUCTION
This action arises from litigation initiated against Chicago Bridge & Iron Company (“CB&I”) with regard to its alleged liability for the costs of cleanup of contaminated properties formerly owned by a former subsidiary of CB&I, American Lumber Treating Co. (“ALT”). The alleged liability arose under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA).
Although CB&I was ultimately found not to be liable as an operator for the costs of cleanup of the properties, see Aluminum Co. of America v. Beazer East, Inc., 124 F.3d. 551 (3rd Cir. 1997), it was unable to recoup *472 all of is losses and expenses incurred by reason of the cleanup and subsequent litigation. CB&I brought this action against Certain Underwriters at Lloyd’s London and Certain London Market Insurance companies (“the London Insurers”), claiming that the excess umbrella insurance policy which CB&I maintained through the London Insurers prior to the initiation of CERCLA liability proceedings requires the London Insurers to indemnify CB&I for the costs incurred in connection with the cleanup and subsequent litigation.
The London Insurers moved for summary judgment and a declaration that the umbrella insurance policy does not provide coverage for liabilities arising out of CB&I’s minority shareholder interest in ALT. CB&I moved for partial summary judgment precluding the London Insurers from raising certain defenses at trial. For the following reasons, both motions for summary judgment are DENIED.
BACKGROUND
Plaintiff CB&I was a minority shareholder in ALT from 1934 to 1954. ALT had numerous sites around the country, including four which are the subjects of this action, located in Westborough, MA; Weed, CA; Joplin, MO; and DeRidder, LA. During the time of CB&I’s minority interest in ALT, i.e. from 1934 to 1954, ALT’S operations at these sites caused seepage of contaminating chemicals into the ground which contributed to environmental damage to the properties.
From 1961 through 1970, CB&I maintained an “umbrella” insurance policy with the London Insurers. An umbrella policy, originally called “blanket catastrophe liability insurance,” provides broader protection than a general liability insurance policy, including coverage for unanticipated “gaps” in primary coverage. Commercial Union Ins. Co. v. Walbrook Ins. Co. Ltd., 7 F.3d 1047 (1993). CB&I’s policy provided coverage for liability resulting from an “occurrence” anywhere in the world. An “occurrence" is defined in the policy as an “accident or event or a continuous or repeated exposure to conditions which unexpectedly or unintentionally results in . . . property damage . . . during the policy period.”
In their motion for summary judgment, defendants argue first that Illinois, and not Massachusetts, law should apply, and that under Illinois law, the policy does not apply because (1) ALT was not insured under the policy, and (2) CB&I did not disclose their relationship to ALT when the insurers were assessing CB&I’s risk and setting their premiums. The London Insurers have further asked for a declaration that Illinois law is applicable in interpreting the insurance policy.
For the purposes of this motion, it appears that there is little or no conflict between the applicable laws of Massachusetts and of Illinois. Since choice of law may be a matter more appropriately decided by the trial judge, and since the choice of law will not affect this decision, this issue need not be decided at this time.
DISCUSSION
Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
Interpretation of the language of an insurance policy presents a question of law. Save-Mor Supermarkets, Inc. v. Skelly Detective Serv., Inc., 359 Mass. 221, 226 (1971). In this task, the court is guided by three fundamental principles: (1) an insurance contract, like other contracts, is to be construed according to the fair and reasonable meaning of its words, [citation omitted]; (2) exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured, (citation omitted]; and (3) doubts created by any ambiguous words or provisions are to be resolved against the insurer, (citation omitted]. Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass.App.Ct. 318, 323-24 (1991).
Scope of Coverage of Umbrella Policy.
The London Insurers contend that they provided coverage to CB&I and its subsidiaries and affiliates during the policy period. They characterize CB&I’s claim as one for coverage for the liability of a company (ALT) that was a subsidiary or affiliate prior to the policy period. This characterization is not entirely accurate. CERCLA imposes strict joint and several liability upon past and present owners and operators of properties. 42 U.S.C. 9601 et seq. CB&I’s alleged potential liability for cleanup costs was direct liability as a past operator of the sites, rather than third-party or vicarious liability for ALT’S activities. In other words, CE&I was being charged in the CERCLA actions with liability for its own actions as an alleged operator, which resulted in property damage before, during and after the policy period. See U.S. v. Kayser-Roth, 910 F.2d 24 (1st Cir. 1990) (defendant held liable for its activities as an operator, not the activities of a subsidiary); Boyd v. Boston Gas, 992 F.2d 401 (1st Cir. 1993) (operator liability of a parent company under CERCLA is direct; it does not require piercing the corporate veil); Pacific Gas & Electric Co. v. Lexington Ins. Co., C.A. No. 94-8209 (Calif.Super.Ct. June 12, 1997) (it is PG&E’s actual or potential liability for which coverage is sought, not the liability of a 3rd party).
Furthermore, to be an operator within the meaning of CERCLA requires more than mere ownership or general authority or ability to control; at a minimum *473 it requires active involvement in the activities of the subsidiary. Kayser-Roth at 3. Thus, CB&I’s potential liability did not “arise” out of its minorily shareholder interest in ALT, as the London Insurers contend, but rather from its own active involvement in ALT’S operations (it should be borne in mind that CB&I has been found not to be an operator within the meaning of CERCLA, and thus not liable for cleanup costs).
Courts have, generally, been unwilling to hold insurance companies liable for the environmental liabilities of companies acquired by the insured after the expiration of an insurance policy. The rationale for this is, of course, that a contrary position would hold insurance companies liable for unforeseeable risks, and would enable an insured to acquire new properties indiscriminately, secure in the knowledge that a past insurer would pay the bill for any liabilities attached to the new company. Clearly, such a situation is distinguishable from the case at hand, in which the insured is seeking coverage for a liability which arose during the policy period, and from its association with a company which it owned previously. Thus, the rationale for excluding after-acquired companies from coverage simply does not apply here. At the time CB&I purchased insurance, its past ownership of ALT was an existing fact, knowable by the London Insurers, which could and may have been taken into account in assessing CB&I’s risk. The insurer’s claim today that they didn’t know about ALT when they assessed CB&I’s risks is not analogous to the situation in which a company, after the expiration of a policy, acquires new risks. See Caterpillar, Inc. v. Aetna Cas. & Sur. Co., Ill.App.3d 1065, 668 N.E.2d 1152 (1996) (holding that insurance doesn’t cover liability for subsidiaries acquired subsequent to policy period; subsidiary had no legal or factual connection with Caterpillar at the time policies were issued); FMC Corp. v. Plaisted. and Cos., et oL (Cal.Ct.App., 6th Dist., March 3, 1998) (“general liability insurer . . . cannot be required to be clairvoyant as to the infinite possible future permutations of fact, fundamental to the very existence of coverage but not in existence during the policy period”).
While general liability insurers “assume the risk of expansion in legal theories of liability applicable to facts that occurred in or before the policy period, FMC Corp. at 17 (emphasis added), they cannot be expected to foresee changes or expansions in the factual basis for liability after the policy has expired. The "change" which triggered CB&I’s potential liability in this case was the passage of CERCLA in 1980; the “factual” basis for its liability existed from the 1940s through the policy period.
Nondisclosure or Misrepresentation by CB&I.
The London Insurers further argue that, had CB&I intended to cover liabilities arising from its past relationship with ALT, then it had a duty to disclose its former interest in the company. However, the London Insurers are apparently unable to establish that, in fact, CB&I did not disclose this information, or that CB&I was asked about its prior holdings. They point to existing documentation that does not include mention of ALT, but their own witness, a former underwriter who may have been involved with writing CB&I’s policy, admits that the documentation does not reflect the entire interchange between the parties. Furthermore, since the liability for which CB&I is suing is a result of its own alleged actions, rather than ALT’S, this point may be irrelevant.
In Tufts v. Comm. Union, 415 Mass. 844 (1993), where Tufts was the parent company of the former owner of a contaminated site, the court held that the insurer had a duty to defend regardless ofTuft’s failure to identify the former owner as a scheduled hazard, which had increased the insurer’s risk of loss. The policy did not seek to identify the ownership of stock or clearly require the insured to disclose property it may have controlled in the past as a result of its ownership of corporate stock. Although the duty to defend is broader than the duty to indemnify, the court’s reasoning in Tufts supports CB&I’s argument that the insurance policy does not expressly limit coverage for property damage liability to damage caused by a named insured.
Even if CB&I had a duty to disclose each and every potential risk, including past holdings, to the London Insurers, the Insurers have not established that CB&I, in fact, failed to disclose this information. At best, they can prove that CB&I’s relationship with ALT is not mentioned in the existing documentation for the policy. In addition, even if an innocent omission on CB&I’s part were proven, a policy can not be voided without proof of intentional misrepresentation or concealment. See Washington v. Mills, 135 Mass. 503 (1883), St. Paul Ins. Co. v. Great Lakes Turnings, 829 F.Supp. 982 (N.D. Ill. 1993). Given that, (1) at the beginning of CB&I’s first policy period, six years had elapsed since they sold their shares in ALT, (2) ALT’S purchaser expressly released ALT of all liabilities, and (3) CB&I’s ALT holdings were never more than 5% of its total assets, it would be reasonable for CB&I to assume that its past shareholder interest in ALT did not create a risk of liability which would be relevant to the insurers’ risk assessment. Indeed, the London Insurers have produced no compelling reason to demonstrate that, had they known of ALT, this knowledge would have substantially affected their evaluation of CB&I’s risk, given that they could not have anticipated or foreseen the future liability potential which would be imposed by the passage of CERCLA in 1980.
ORDER
For the foregoing reasons, the defendant’s motion for summary judgment is DENIED. The plaintiffs motion to bar certain defenses from being raised at trial, captioned as a motion for summary judgment, is also DENIED.