Kottmyer, J.
BACKGROUND
Plaintiff Chicago Bridge & Iron Company (“CBI”) seeks a declaration that the defendants, Certain Underwriters at Lloyd’s, London and Certain London Market Insurance Companies (“London Insurers”), are required to indemnify it for losses arising out of claims asserted against it under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (“CERCLA”) and similar state laws. The underlying claims involve the cleanup of four sites contaminated by the operations of a now-defunct wood treating concern, American Lumber & Treating Company (“ALT”), during the period 1936-46, with contamination allegedly continuing to the present. ALT’S operations at eighteen sites around the country allegedly caused seepage of chemicals into the ground which contributed to environmental damage to the properties.*
The theory advanced against CBI in the underlying case was that, as a minority shareholder of ALT during the period August 1934 to April 1954, CBI exercised sufficient control over ALT that CBI itself could be deemed an “operator” of the sites under §107(a)(2) of CERCLA. In 1997, after more than a decade of litigation, the Third Circuit Court of Appeals held that CBI was not liable as an operator for damages arising out of ALT’S operations. Aluminum Co. of America v. Beazer East, Inc., 124 F.3d 551 (3rd Cir. 1997). The trial court’s findings of fact, Aluminum Co. of America v. Beazer East, Inc., No. 91-0092 (W.D.Pa. June 27, 1996), were not disturbed on appeal.
The defendants underwrote a series of umbrella liability policies issued to CBI for the period March 18, 1961 to February 1, 1970, with liability limits of $10-20 million. CBI had also purchased policies in the London Market during the period 1956-61, under which it has not sought coverage. The 1961-70 policies state that the London Insurers will indemnify CBI for “damages, direct or consequential and expenses all more fully defined by the term ‘ultimate net loss’ on account of. . . ‘property damage’ caused or arising out of each occurrence happening anywhere in the world.” The term “ultimate net loss” is defined in the policies. See pp. 16-17, infra. The policies have self-insured retentions (“SIR(s)’j of $100,000 per occurrence.
The policies define “occurrence” as “(a]n accident happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in . . . property damage . . . during the policy period.” The policies also have “Prior Insurance and Non Cumulation of Liability” conditions. The policies state:
It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon ... *392 shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.
Subject to the foregoing paragraph and to all the other terms and conditions of this policy in the event that . . . property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured for liability in respect of such ... property damage without payment of additional premium.
CBI seeks a declaration that London Insurers must indemnify CBI for its ALT-related losses, including loss of use of settlement funds and attorneys fees and other expenses, for a total of approximately $5.5 million, excluding accrued interest. CBI’s theory is that an occurrence triggering coverage occurred during each policy period because creosote migrated continuously and/or dissolved continuously causing further contamination at the subject sites from at least the early 1940s through at least the early 1990s. Plaintiff Chicago Bridge & Iron Company’s Supplemental Answer to “Expert Interrogatories” Propounded By Defendants atp. 6-14.
The parties have filed a number of Motions in Limine seeking pretrial rulings concerning applicable law, burden of proof and admissibility of evidence. They have stipulated that, in the event the case is tried before a different judge, this Court’s rulings on the motions in limine will be fully binding on the parties for the purposes of trial (“the Stipulation”).
A. DEFENDANTS’ MOTION IN LIMINE ON CHOICE OF LAW
The defendants have filed a motion in limine seeking a ruling that Illinois law governs interpretation of the policies. The plaintiff agrees with that proposition generally, but objects to the issuance of a blanket ruling to that effect. For the reasons which follow, the defendants’ motion in limine on choice of law is granted.
DISCUSSION
Massachusetts employs a “functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole.” Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631 (1985). In Bushkin, Massachusetts adopted the approach set forth in §188 of the Restatement (Second) of Conflict of Laws, holding that in the absence of a choice of law by parties, contract rights “are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in §6 [of the Restatement].” Bushkin, 393 Mass, at 631-32, citing Restatement §188(1).
Citing Bushkin, 393 Mass. at 630-31, plaintiff argues that a blanket ruling is unwarranted and seeks to reserve the right to relitigate choice of law if another state has the “most significant relationship” to the parties or controversy as to a particular issue. Restatement §193,[1] like §188, does provide an explicit exception with respect to particular issues. However, the plaintiff has not identified any circumstance in the present case which would arguably bring this rule into play, e.g., a shift in the principal location of a risk. See comment d to §193.[2]
The Supreme Judicial Court has stated that to obtain uniform and practical coverage nationwide for a multi-state corporation, it is desirable that the law of one state govern the interpretation of comprehensive general liability policies. W.R. Grace v. Hartford Acc. & Ind. Co., 407 Mass. 572, 585 (1990). In that case, a New York-based policyholder was seeking coverage under excess policies negotiated in New York through a New York-based broker for approximately 7500 personal injury and properly damage asbestos claims. The claims were asserted in courts of various jurisdictions, including Massachusetts. Id. at 574-75. The Court held that whether there was a specific duty to defend or a duty to indemnify under a comprehensive general liability policy should not depend on the jurisdiction in which a particular claim was pending, but instead should be determined by the law governing the interpretation of the policy and its issuance. Id. at 586.
Notwithstanding the fact that some of the claimants in the underlying suits in W.R. Grace were Massachusetts residents, the Court, relying on the following contacts, held that New York law applied to the interpretation of the policies at issue: (1) the defendant insurers were licensed to do business in NewYork; (2) the policyholder was a New York-based conglomerate; and (3) the policies were negotiated in New York through a New York-based broker. Id. at 584. The Court concluded that application of New York law would offer the prospect of certainty, predictability, and uniformity of result, conform to the justified expectations of the parties, and produce the most coherent interstate insurance coverage. Id. at 585-86.
Applying the rationale set forth in W.R. Grace, Illinois clearly has the most significant relationship with the issuance of the comprehensive general liability policies at issue in this case. Plaintiff is a multi-national Illinois corporation which has maintained its headquarters in Illinois from 1889 to present. The policies at issue were negotiated and issued to plaintiff in Illinois through an Illinois-based insurance broker. Application of Illinois law offers the prospect of certainty, predictability, and uniformity of result necessary to conform to the justified expectations of the parties and will produce the most coherent interstate insurance coverage. Accordingly, the defendants’ motion is granted. Illinois law governs the interpretation of the policies.
*393 B. DEFENDANTS’ MOTION IN LIMINE TO PRECLUDE INTRODUCTION OF EXTRINSIC EVIDENCE — ALLOCATION OF DAMAGES
Defendants moved for an order precluding CBI from introducing extrinsic evidence as to the meaning, interpretation, or application of the terms and conditions of London Insurers’ policies. The parties subsequently filed memoranda on the issues of trigger of coverage[3] and allocation among triggered policies, the issues which generated this motion. The Court is therefore ruling on the trigger of coverage and allocation issues pursuant to the terms of the Stipulation.
The underlying claims against CBI involve allegations and evidence of progressive environmental contamination. In cases involving continuing environmental pollution difficult to pinpoint in time and degree, courts have recognized several theories for triggering coverage and allocating damages among policy periods and uninsured or self-insured periods. See, e.g., Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes (6th ed. 1993) §9.04(b). One theory for triggering coverage is the continuous trigger of liability. Under the continuous trigger theory, when an injury is deemed a continuous process, all insurance policies in effect during the period of exposure or at the time of manifestation or at anytime in between are triggered by the injury. See, e.g., Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co., 52 Cal.Rptr.2d 690, 701 (Cal.Ct.App. 1996).[4]
Regardless of the terminology used and the nature of the process giving rise to the injury or damage in a particular case, the question whether the policy provides coverage depends on the language of the policy. Zurich Ins. Co. v. Raymark Industries, Inc. 514 N.E.2d 150, 159-61 (Ill. 1987). Established rules of construction require that all provisions of an insurance contract be read together to interpret it, that words of a policy be given their plain and ordinary meaning, that the court not stretch to find an ambiguity when none is present and that any ambiguity be construed in favor of the insured and against the insurer. See Zurich, supra; Outboard Marine Corp. v. Liberty Mutual Ins. Co., 607 N.E.2d 1204, 1212 (Ill. 1992).
The policies at issue in this case and, in particular, the definition of “Occurrence” and the “Prior Insurance and Non Cumulation of Liability” conditions, provide for coverage where property damage during the policy period results from a process which commenced before and continued after the policy period. The insurable event which gives rise to coverage is property damage during the policy period. Neither the “all sums” clause, quoted at p. 18, infra, nor any other language in the policies limits the insurers’ liability to losses attributable to property damage occurring during the policy period. No language in the policies permits proration among triggered policies. See Aerojet General Corp. v. Transport Indem. Co., 948 P.2d 909, 919 n. 10 (Cal. 1997); J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 507, 508 (Pa. 1993). See also, Zurich Ins. Co., supra. Compare Insurance Co. Of N. America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1227-28 (6th Cir. 1980) (policy terms limit coverage to property damage during policy period); Northern States Power Co. v. Fidelity & Cas. Co. Of New York, 523 N.W.2d 657, 659 (Minn. 1994) (same).[5]
Relying on Outboard Marine II, supra, and Missouri Pacific Railroad Co. v. Int’l Ins. Co., 679 N.E.2d 801, 808 (Ill. App. 2 Dist. 1997), defendants strenuously argue that damages must be allocated on a prorata/time-on-the-risk basis with uninsured periods allocated to CBI as a self-insurer. CBI contends that all its losses in this case are covered under London Insurers’ March 1961 policy, because of that policy’s “Prior Insurance and Non Cumulation of Liability” conditions.
In Outboard Marine, the claims arose out of groundwater contamination caused by die casting operations over a twenty-year period. The trial court held that the contamination constituted an indivisible single occurrence, and that it was impossible to allocate the property damage to any given years with any degree of certainty. Consequently, the damage was allocated on a pro-rata/time-on-the-risk basis, including to Outboard Marine itself for uninsured periods. On appeal, the Court rejected the argument that proration was inconsistent with the “all sums” language of the comprehensive general policies at issue. Id. at 748-49. Accord Missouri Pacific Railroad Co. v. Century Ind. Co., 679 N.E.2d at 808 (prorating asbestos claims where time of injuries could not be established with reasonable scientific certainty).
CBI argues that this case is controlled by Zurich Ins. Co. v. Raymark Indus., Inc., 514 N.E.2d 150 (1987), where the Illinois Supreme Court rejected a prorata/time-on-the-risk approach[6] in a case involving bodily injuries in the context of asbestos-related claims. It is true that allocation rules as well as coverage triggers for bodily injury claims have been recognized as distinct from those for property damage claims. Gypsum, 643 N.E.2d at 1253. See also Home Ins. Co. v. Landmark Ins. Co., 253 Cal.Rptr. 277, 281 (Cal.App. 4 Dist. 1988); Prudential-LMI Commercial Ins. v. Superior Court, 798 P.2d 1230, 1245-46 (Cal. 1990) (as modified). See also Ostrager & Newman, Handbook on Ins. Coverage Disputes (6th ed. 1993) §9.03(b). Nonetheless, Zurich controls analysis of the allocation issue in this case because the Supreme Court made clear in that case that issues like coverage and allocation must be resolved by application of established rules of construction to the language of the individual policy in question. Regardless of the perceived merits of the pro rata/time-on-the-risk method of allocating damages in a case involving continuing injury or property damage,[7] the judicial rewriting of the policies and, in particular, the March *394 1961 policy, which would be required to achieve that result in this case is foreclosed by Zurich.
In addition to the fact that neither the definitions of Ultimate Net Loss and occurrence nor any other language in the policy limits the insurer’s responsibility to losses attributable to property damage during the policy period, proration is inconsistent with the Prior Insurance and Non Cumulation of Liability conditions of that Policy. See p. 3, supra. Those conditions state that where a preexisting “excess policy issued to the Assured” provides coverage, the limit of liability is reduced by the amount recoverable under the prior policy. As to property damage which continues after the policy period, “Underwriters will continue to .protect the Assured . . . without payment of additional premium.”
Defendants point out that the Court in Outboard Marine II specifically addressed the applicability of a similar clause in light of the pro rata/time-on-the-risk allocation there applied. 670 N.E.2d at 750. The Court stated that it would be “illogical to enforce one insurer’s clause in a situation involving a ‘continuing occurrence’ which theoretically could be looked at as a separate occurrence for the purpose of each policy which has been assessed a pro rata damage allocation." Id. In Outboard Marine II, the Court thus declined to enforce otherwise applicable contract language because it was inconsistent with the method of allocation it had imposed. Outboard Marine thus supports CBI’s position that pro rata allocation is inconsistent with the language of the policies. As pointed out by the plaintiff, this inconsistency highlights the deviation from established rules of construction which underlies the Court’s holding in Outboard Marine II.
The Court therefore rules that (1) coverage under the policies is triggered by property damage during the policy period; (2) allocation of liability is governed by the terms of the policy; (3) the policies do not limit the insurer’s responsibility to losses attributable to property damage during the policy period; (4) the policies do not permit a pro-rata/time-on-the-risk allocation among triggered policies and CBI as self-insurer; and (5) the Prior Insurance and Non Cumulation conditions are operative and enforceable.
C. DEFENDANTS’ MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF EVIDENCE CONTRARY TO RULINGS MADE IN THE UNDERLYING BEAZER ALLOCATION LITIGATION.
The defendants have filed amotion in limine seeking an order precluding all parties from introducing evidence contrary to rulings made in the underlying Beazer litigation.
DISCUSSION
Beazer was tried without a jury and resulted in findings and rulings set forth in a memorandum opinion and order. Aluminum Co. of America v. Beazer East, Inc., No. 91-0092 (W.D.Pa. June 27, 1996). The judgment entered pursuant to that opinion was affirmed on appeal by the Third Circuit, and the trial judge’s pertinent findings of fact were not disturbed. Aluminum Co. of America v. Beazer East, Inc., 124 F.3d 551, 562-65 (3d Cir. 1997). The trial court’s findings of fact related to the narrow legal issue presented in that case, i.e., whether CBI was an operator as defined in CERCLA, and, in particular, the extent to which CBI exercised actual control over ALT.
Defendants state that all parties should be bound by the findings and rulings entered in the underlying action. As CBI observes in its opposition, however, London Insurers misstate those findings and rulings in a manner designed to serve their short-term interests in the instant case.[8] Specifically, CBI argues that the London Insurers incorrectly state that the Beazer litigation involved eighteen (18) ALT sites. The result which the London Insurers seek to achieve, in part, by this “motion in limine” is the assessment of eighteen (18) separate self-insured retentions for each policy year against CBI prior to any recovery in this case as London Insurers’ policies assess against CBI an SIR of $100,000 per “occurrence.”
Nonetheless, the general principle espoused by London Insurers is correct: facts and issues may be treated as concluded when determined in prior litigation. Appleman’s Ins. L. & Prac. §11520. The Court therefore grants defendants’ motion in limine for an order precluding the parties from introducing evidence contrary to rulings made in the underlying Beazer Allocation Litigation. Of course, this ruling will not come into play until the defendants satisfy the trial court that the facts and rulings in question were actually found and made by the trial court in the Beazer litigation.
D. PLAINTIFF’S MOTION IN LIMINE FOR DETERMINATION OF REQUISITES OF PROOF OF “ULTIMATE NET LOSS.”
Plaintiff moves in limine for an order that, to establish a prima facie case, CBI only need show that the litigation costs for which it seeks indemnification were incurred by CBI in good faith and as a consequence of an “occurrence” covered by insurance policies issued by defendants.
DISCUSSION
While not strictly a motion in limine, this motion will be addressed pursuant to the terms of the Stipulation.
CBI argues that the insurance policies at issue in this case do not impose upon it the burden of demonstrating that costs incurred by CBI in good faith as a consequence of a covered occurrence were “reasonable.” London Insurers’ policies obligate them to indemnify CBI for covered “ultimate net loss.” Ultimate net loss is defined in the policies as:
*395 the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of property damage . . . either through adjudication or compromise, and shall also include ... all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses, and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured’s or of any underlying insurer’s permanent employees.
London Insurers contend that they are required to indemnify CBI only for reasonable costs incurred in connection with the underlying claims. But they cite neither contract language nor controlling case law imposing a burden of proving reasonableness on the insured. Instead, they rely upon a case involving a judicially-fashioned exception to the right of an insurer under a primary liability policy to select counsel and control the defense of the underlying claim. See Illinois Masonic Medical Ctr. v. Turegum Ins. Co., 522 N.E.2d 611 (Ill. App. 1 Dist. 1988). Under a primary liability policy, the insurer typically has not only a duty, but a right to undertake and control the defense of a third-party claim. In certain circumstances, however, an insurer’s interests may come into conflict with those of the policyholder. In Illinois Masonic Medical Ctr., the Court held that “where a conflict of interest exists the insured, rather than the insurer, is entitled to assume control of the defense of the underlying action; but by reason of its contractual obligation to furnish a defense, the insurer must underwrite the reasonable costs incurred by the insured in defending the action with counsel of his own choosing.” Id. at 613, citing Thornton v. Paul, 384 N.E.2d 335, 343 (Ill. 1978). Masonic Medical Center does not discuss the allocation of the burden of proof as to “reasonableness.”[9] Even assuming that the burden does fall on the policyholder in the above context, it does not follow that a policyholder seeking to recover “ultimate net loss” under an excess or umbrella policy bears the same burden.
Unlike a primary liabilily policy, an excess or umbrella policy does not confer upon the insurer the right to control the defense of the underlying action. Rather, as in this case, under the Assistance and Co-Operation clause, the carrier has the right and opportunity to associate with the policyholder or the policyholder’s underlying insurers, or both, in the defense of a claim. London Insurers did not avail themselves of this option with regard to the Beazer Allocation Litigation.[10]
London Insurers also note that under Illinois law the insured has the ultimate burden of proving that its loss falls within the Insuring Agreements of an insurance policy. See St. Michael’s Orthodox Catholic Church v. Preferred Risk Mutual Ins. Co., 496 N.E.2d 1176, 1178 (Ill. App. 1 Dist. 1986); Miner v. Bray, 513 N.E.2d 580, 582 (Ill. App. 3 Dist. 1987). This is true but irrelevant; CBI does not dispute that it carries the burden of proving that the losses it seeks to recover were covered losses.[11]
An insurer’s liability for costs incurred by the insured is not unlimited. There is implied in every contract, including insurance, a covenant of good faith and fair dealing. Saunders v. Michigan Ave. Nat'l Bank, 662 N.E.2d 602, 609 (Ill. App. 1 Dist. 1996); Brase v. Loempker, 642 N.E.2d 202, 206 (Ill. App. 5 Dist. 1994), app. den., 647 N.E.2d 1007 (Ill. 1995). Accord Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991); Thaler v. The Am. Ins. Co., 34 Mass.App.Ct. 639, 642 (1993). Of course, London Insurers has the burden of proving that CBI breached that covenant. Cf. Kohlmeier v. Shelter Ins. Co., 525 N.E.2d 94, 104 (Ill. App. 5 Dist. 1988), app. den., 530 N.E.2d 247 (Ill. 1988) (insurer breached covenant). Accord Trempe v. Aetna Casualty & Surety Co., 20 Mass.App.Ct. 448, 456 (1985).
The plaintiffs motion to clarify its burden of proof on ultimate net loss is therefore granted. Plaintiff is not required to establish as part of its prima facie case that costs and expenses it incurred in good faith as a result of an occurrence covered by the policy were reasonable.
E. DEFENDANTS’ MOTION IN LIMINE TO PRECLUDE INTRODUCTION OF OTHER LONDON POLICY INFORMATION.
Defendants seek an order that plaintiff be precluded from introducing evidence of pre-1961 and post-1970 policies. In support of this motion, defendants assert that these policies are not at issue in this case.
CBI opposes the motion to the extent that it seeks exclusion of evidence relating to policies it purchased in the London Market during the period 1956-61. For the reasons which follow, defendants’ motion in limine is granted as to the post-1970 policies and denied as to the 1956-61 policies.
DISCUSSION
The sole grounds asserted by defendants in support of their motion to exclude evidence of the pre-1961 policies is their conclusory statement that the policies are not relevant and would confuse and mislead the juiy by directing attention away from the 1961-70 policies under which plaintiff seeks coverage.
Plaintiff correctly points out that the policies it purchased in the London Market during the period 1956-61 are relevant to the “Prior Insurance and Non Cumulation of Liability” condition of the 1961-70 policies. Under that provision, the earliest applicable policy covers a loss except to the extent that higher limits are available under later policies.
*396 As a general rule, once coverage of a basic risk is established, the burden shifts to the defendant insurers to prove the applicability of any exclusion to coverage set forth outside the insuring clause. Ratner v. Canadian Universal Ins. Co., Ltd., 359 Mass. 375, 381 (1971); Murray v. Continental Ins. Co., 313 Mass. 557, 563 (1943); Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass App. Ct. 318, 321 (1991). Allowance of this motion as drafted would prevent plaintiff from introducing evidence concerning the pre-1961 policies if defendants raised the “Prior Insurance and Non Cumulation of Liability” condition of the 1961-70 policies as a defense.
For the foregoing reasons, the defendants’ motion in limine to preclude introduction of other London policies is denied as to the pre-1961 policies without prejudice to renewal in the event that defendants stipulate that they are not asserting any defense under the "Prior Insurance and Non-Cumulation of Liability” clause of the 1961-1970 policies. The motion is allowed as to the post-1970 policies.
F. PLAINTIFF’S MOTION IN LIMINE FOR DETERMINATION OF REQUISITE PROOF OF PROPERTY DAMAGE ALLEGED IN UNDERLYING CLAIMS.
CBI has moved for an order setting forth the nature of the showing that must be made concerning the property damage alleged in the underlying Beazer Allocation Litigation (“Beazer litigation”) to demonstrate the applicability to those claims of certain insurance policies sold to CBI by the London Insurers.
In effect this motion seeks a ruling as to the sufficiency of evidence to establish coverage and the Court therefore declines to address the issue presented via a motion in limine.

Editor’s Note: For other opinions in this matter see 8 Mass. L. Rptr. 471 and 9 Mass. L. Rptr. 388.

In the absence of a choice of law by parties, insurance contract rights “are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in §6 to the transaction and the parties, in which event the local law of the other state will be applied.”

In other states rejecting the lex loci rule, “the validity of the contract and the rights created thereby are determined, except as to minute details of performance, by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy.” Couch on Insurance 3d §24.18.

“ ‘[TJrigger of coverage’ is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the potential of coverage to arise.” Montrose Chemical Corp. of California v. Admiral Insurance Co., 913 P.2d 878, 880 n.2 (1995).

Although the Illinois Supreme Court has not ruled on the applicability of the continuous trigger theory in a case involving continuing property damage, two appellate courts have embraced it. See Outboard Marine Corp. v. Liberty Mutual Ins. Co., 670 N.E.2d 740 (Ill. App. 2 Dist. 1996) (Outboard Marine II), discussed infra, and United States Gypsum Co. v. Admiral Ins. Co., 643 N.E.2d 1226 (Ill. App. 1 Dist. 1994). In Gypsum, the Court further held that because the properly damage resulted from a continuing process, a single occurrence was present and the insured was subject to a single deductible for each policy period, Id. at 1259-60. The Gypsum Court did not addfess the question of allocation among triggered policies, but quoting Sentinel Ins. Co., supra, described the cases adopting the continuous trigger theory as imposing joint and several liability on triggered policies to the extent of their limits. Gypsum, 643 N.E.2d at 1256. As discussed infra, under Illinois law trigger of coverage and allocation among policies must be determined by reference to the language of the individual policies.

Both Forty-Eight Insulations, Inc. and Northern States Power, Co., unlike the present case, involved policies which contain variants of Policy Period/Territory provisions, i.e., language to the effect that the policy applied only to injury or damage which occurs during the policy period within the policy territory.

In Missouri Pacific, the Second District distinguished Zurich and refused to apply its holding to continuous property damage.
We read nothing in Zurich as precluding the application of the pro rata, time-on-the-risk allocation method announced in Outboard Marine to the case at bar. Zurich's rejection of a pro rata approach was based on the narrow facts of the case before it, namely, that it had rejected the trigger analysis set forth in Forty-Eight Insulations. The court did not adopt a general rule forever precluding the application of a pro rata approach.
Missouri Pacfic, 679 N.E.2d at 808. See also Outboard Marine II, 670 N.E.2d at 748-49; Armstrong, 52 Cal.Rptr.2d at 709. But see, Benoy Motor Sales, Inc. v. Universal Underwriters Ins. Co., 679 N.E.2d 414, 418 (Ill. App. 1 Dist. 1997), citing Zurich by analogy.

It is argued that the inherent simplicity of proration promotes predictability, reduces incentives to litigate and lowers premium rates. Michael G. Doherty, Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U.Chi.L.Rev. 257, 281 (1997).

In effect, the ruling requested by defendants would penalize CBI for protecting itself and the defendants from potential future liability by agreeing that the holding of the Court in the Beazer litigation which involved four ALT sites would apply to any additional ALT sites at which damage is claimed to have occurred.

Further, like Thorton itself, the majority of insurance conflict of interest cases that cite Thornton do not impose a requirement of reasonableness; the cases simply state the rule that an insurer is responsible for the costs of its insured’s defense. See e.g., Matter of New Era, Inc., 135 F.3d 1206, 1211 (7th Cir. 1998).

Further, the Court observes that when courts have considered whether attorneys fees were reasonable, the burden of production and persuasion has not uniformly been placed on the plaintiff. See, e.g., Thomas W. Hooley & Sons v. Zurich Gen. Acc. & Liability Ins. Co., 103 So.2d 449, 454 (La. 1958).

Other authorities cited by defendants are inapposite. Bethishou v. Levy, 1989 U.S. Dist. LEXIS 12112 (ND. Ill. Oct. 5, 1989), awarded attorneys fees under the Fair Housing Act, 42 U.S.C. §3601. Hensley v. Eckerhart, 461 U.S. 424 (1983), awarded attorneys fees under the Civil Rights Attorneys Fees Awards Act, 42 U.S.C. §1988. 7C John Alan Appleman, Insurance Law & Practice §4691 at 261 discusses the rights an insured possesses where an insurer unwarrantedly refuses to defend a suit against him, and relies on no Illinois precedent.