In March, 1942, the defendant Edward P. Mahaffy applied for and was issued $20,000 of life insurance, in eight policies for $2,500 each, by plaintiff Aetna Life Insurance Company. The policies contained identical clauses providing for double indemnity in event of death by accidental means and for waiver of premiums *Page 893 
in event of total disability before age sixty. A two-year incontestability clause applied only to the principal life insurance obligation, and not to the double indemnity and waiver of premium on total disability provisions.
On or about March 1, 1946, Mahaffy made claim for waiver of premiums under the total disability clauses, asserting blindness as a ground, this being one of the forms of total disability listed in the policies. After some investigation of the circumstances connected with the inception of the policies, the Company in May, 1946, notified Mahaffy that it would cancel the contestable portions of the policies on account of alleged "material misrepresentations" connected with his application for the insurance in 1942. The effect of the Company's allegations was that Mahaffy had concealed his approaching blindness when he applied for the insurance Mahaffy refused the Company's request that he deliver up the policies for rewriting. The Company then filed this bill in equity praying that the contestable portions of the policies be cancelled, and Mahaffy cross-complained asking that the clauses providing for waiver of premiums be declared operative as of the date when total disability was claimed. The Chancellor after hearing evidence found all issues for the defendant, both on the original bill and the cross-complaint, and decreed that the policies were effective according to their terms. This included a determination that Mahaffy should receive back from the Company the amount of certain premiums (which he had paid in order to be sure the policies were kept alive, after claiming rights under the waiver of premium clauses) plus interest, damages, costs and a $1,000 attorneys' fee. From this decree the Company appealed.
The evidence indicates that Mahaffy had started wearing glasses during the year before March, 1942, when he applied for these policies and that on December 11, 1941, he made a short call on Doctor R. J. Calcote, a Little Rock physician specializing in eye diseases. Mahaffy testified that the purpose of the visit was "to see about new glasses." Doctor Calcote in his private notes on the visit indicated that Mahaffy's trouble was "probably *Page 894 
retinitis pigmentosa." This is an incurable disease normally leading to blindness, and is in fact the disease from which it was later ascertained that Mahaffy suffers. The doctor, however, did not tell Mahaffy what his diagnosis was, except that he had "gun barrel vision" which he explained as being a narrowing of the field of vision comparable to that which occurs when one looks down the barrel of a gun. The width of the area of Mahaffy's vision was then about one-third of the normal field. He warned Mahaffy that he ought not to drive a car, at least in heavy traffic, but apparently did not say anything that would warn a layman such as Mahaffy that he was going blind. He did not prescribe new glasses. Mahaffy had no further contact with Doctor Calcote until 1946 because the doctor went into the Army shortly after the December, 1941, consultation.
Within a few months after the policies were issued, Mahaffy consulted three other doctors about his eyes. These included a specialist at Memphis whose diagnosis was inconclusive, his family physician at Little Rock who undertook no diagnosis, and Mayo's Clinic at Rochester, Minn., where on August 26, 1942, his condition was definitely diagnosed as retinitis pigmentosa. At Mayo's he was told that he had this disease and that by reason of it the range of his vision would become narrower and narrower until he was blind. No hope for cure was held out to him.
The "history" given by Mahaffy to each of the physicians consulted by him indicated an awareness on his part for some time past that there was something wrong with his eyesight. There were sharp differences in the testimony as to how far this awareness went.
After the consultation at Mayo's, Mahaffy returned to Jefferson county where he continued his normal and numerous activities at his store, gin, and plantation, though his failing eyesight made it increasingly difficult for him to do many of the things that he had done freely before. Late in 1943 his son was discharged from the Army so that he might begin to take over the *Page 895 
management of the farm, and by 1945 or 1946 Mahaffy's activities were limited largely to an advisory character. This was the situation when he made his claim for waiver of premiums under the total disability clauses.
The insurance application form which Mahaffy filled out in March, 1942, which was made a part of the policy, included the following questions and answers:
"j. Have you had regular or occasional health examinations? Yes. Date of last? Nov. — 41. By Doctor Lowe. Address Pine Bluff, Arkansas.
"k. Name of any impairments ever found. None.
"l. When and for what reason did you last consult a physician? Nov. — 1941 — check up.
"m. May any of these physicians be conferred with and disclose facts known to them? (Yes or No) Yes."
The form also included inquiries concerning several specific parts or areas of the body, not including the eyes or eyesight.
There was evidence that a separate series of questions was orally propounded to Mahaffy by the Company's medical examiner, though not made part of the policy, including the question: "Is there any impairment of eyesight?" to which the reply was "No." As to this, Mahaffy testified that he did not remember being asked the question, but "I imagine I said that . . . because I didn't think it was anything that glasses wouldn't cure." Defendant's examiner testified that he and the Company were not interested in such ordinary impairments of vision as might be corrected by wearing glasses, and that he would "probably not" have made any note of the fact that there was an impairment of vision corrected by wearing glasses. Mahaffy explained his failure to mention the visit to Doctor Calcote, in his answer to the inquiry concerning "health examinations," by testifying that he went to Calcote principally "to see if he could improve on" his glasses, that he attached no particular importance to the reference to "gun barrel vision," and that no information he had received up to *Page 896 
that time indicated to him that there was anything really serious the matter with his eyes.
The problem here is primarily one of fact. Appellant and appellee are agreed that this is true, and they are also substantially agreed on how this problem must be stated, in view of the Chancellor's finding for the insured below. The question is whether a preponderance of the evidence in the record shows a knowing misrepresentation, or a knowing concealment, by Mahaffy, of the fact of incipient blindness.
"If the applicant states what he honestly believes to be true regarding his physical condition, the fact that it turns out to be not true does not avoid the policy, as it is a representation merely. Of course, if his statements are false and known to him to be false, and are made fraudulently, they have the same effect as warranties. . . . The question will be then were his statements made in good faith, if untrue, or were they made knowing them to be false and for the purpose of defrauding. . . ." Harper v. Bankers Reserve Life Co., 185 Ark. 1082,1085, 51 S.W.2d 526, 528. "The questions propounded in the application . . . call for answers founded on the knowledge or belief of the applicant, and in such cases a misrepresentation or omission to answer will not avoid the policy unless willfully or knowingly made with an (intent) to deceive." Metropolitan Life Insurance Co. v. Johnson, 105 Ark. 101, 106,150 S.W. 393, 395. "This court has often held that questions propounded to applicants for insurance with respect to consultation with and treatment by physicians do not contemplate answers with respect to trivial ailments. . . ." Southern National Insurance Co. v. Pillow, 206 Ark. 769,778, 177 S.W.2d 763, 767. "The burden is upon (the insurer) to establish the fraud by proving affirmatively the falsity, materiality and bad faith in the representations made by the insured in the application regarding his health." Old Colony Life Insurance Co. v. Julian,175 Ark. 359, 365, 299 S.W. 366, 368.
We have analyzed the evidence in this record with great care. Our conclusion is that we are unable to say *Page 897 
that the finding of the Chancellor, in favor of the insured, on the question properly before him, was contrary to a preponderance of the evidence.
Appellant Company raises a further question under the policy clause which provides: "That no such policy shall become effective until the first premium upon it is paid during the good health of the insured. . . ." The contention is that, since insured was in fact suffering from retinitis pigmentosa, whether he knew it or not, the first premium actually was not paid "during the good health of the insured." This provision does not constitute a warranty of good health at the time specified, but only amounts to a stipulation for apparent good health and good faith in the applicant. Further, the clause is directed primarily to diseases or injuries, seriously affecting the risk, which develop or are discovered by the insured after the application and examination are completed as distinguished from conditions which are presumably checked on by the insurer's earlier examination. See Lincoln Reserve Life Insurance Co. v. Smith,134 Ark. 245, 203 S.W. 698; Appleman, Insurance Law and Practice (1941), 154; Cooley, Briefs on Insurance (1927) 648. The statement in National Life Accident Insurance Co. v. Matthew's, 198 Ark. 277, 128 S.W.2d 695, that a somewhat similar clause constituted a warranty is not relevant here, since that case, unlike this one, involved a so-called "non-medical policy," issued without physical examination by the insurer. See National Life 
Accident Insurance Co. v. Young, 200 Ark. 955, 141 S.W.2d 838.
Appellee has asked this Court to allow a further attorneys' fee, in addition to that allowed by the Chancery Court. This we decline to do.
The decree of the Chancery Court is affirmed. *Page 898