118 So.2d 718

Rex BALL

v.

NATIONAL LIFE & ACCIDENT INSURANCE CO. OF NASHVILLE, TENN.

5 Div. 523.

Court of Appeals of Alabama.

April 7, 1959.

Rehearing Denied May 12, 1959.

Reversed on Mandate Feb. 23, 1960.

Lee & Irby, Opelika, for appellant.

Walker & Walker, Opelika, for appellee.

**PRICE, Judge.**

Appellant brought this suit to recover on a policy insuring the life of his brother, John C. Ball, who died December 1, 1955. Appellant was named beneficiary.

The cause of action was stated in one count, substantially in Code form, Code 1940, Tit. 7, § 223, form 12. The pleading thereto was in short by consent, the general issue.

The court gave to the jury the affirmative charge, with hypothesis, in favor of defendant. Judgment was rendered accordingly. Plaintiff appeals.

In the application for the issuance of the policy the insured stated he was in good health; had had no illness in the past five years; had never had heart disease, and had never been confined to a hospital.

The application was not made a part of the policy, and while, under our statute, Sec. 75, Title 28, Code 1940, the statements in the application are not considered warranties, they may nevertheless be received as evidence of representations in support of a plea of fraud and deceit. Independent Life Ins. Co. of America v. Butler, 221 Ala. 501, 129 So. 466; North

**596**

Carolina Mutual Life Ins. Co. v. Coleman, 32 Ala.App. 287, 26 So.2d 114, certiorari denied 248 Ala. 32, 26 So.2d 120.

The policy contains the following provision:

"(7) Effective Date—This policy shall take effect on the Date of Issue, provided the insured is then alive and in sound health, but not otherwise."

 This provision is in legal effect a warranty. Reliance Life Ins. Company v. Sneed, 217 Ala. 669, 117 So. 307; North Carolina Mutual Life Ins. Co. of America v. Coleman, supra; Vredenburgh v. Liberty National Life Ins. Co., 246 Ala. 251, 20 So.2d 207. "To avoid the policy the unsound health must be such as to increase the risk of loss." Life Ins. Co. of Virginia v. Newell, 223 Ala. 401, 137 So. 16, 18; Vredenburgh v. Liberty National Life Ins. Co., supra.

The plaintiff testified he gave his brother's name to defendant's agent and suggested that perhaps his brother did not have any insurance. The policy was later written, issue date being September 12, 1955. The plaintiff stated he was not aware that his brother had previously been admitted to a hospital in May, 1952, for arterial hypertension, arteriosclerosis, angina pectoris, and coronary thrombosis with myocardial infarction, and did not know he had heart trouble. His brother had not told him of such condition; that he was in Korea in 1952, and no member of his family wrote him about his brother's illness. He further testified that the "Notice of Claim, Proof of Death" filed with defendant giving cause of death as "heart failure" was filled out by defendant's agent and signed by him.

For the defendant Dr. William E. Storey testified he first saw insured, John C. Ball, on April 28, 1952, when he was admitted to a hospital in Columbus, Georgia. He stated: "The net effect of my examination confirmed by appropriate tests—technical tests —clearly established a diagnosis of coronary thrombosis with myocardial infarction." By coronary thrombosis he meant, "A clot which completely obstructs one of the nourishing vessels to the heart muscle,— one of the so-called coronary vessels, and as a result of that obstruction that portion of the heart muscle beyond the obstruction is deprived of nourishment and oxygen. That brings in the myocardial infarction, which simply means an area of impoverished nourishment in the heart muscle."

He also noted that although Mr. Ball's blood pressure was dangerously low when first checked, a characteristic of thrombosis, it began to climb so it was clear that he also suffered, and had previously suffered, from high blood pressure. Mr. Ball stayed in the hospital until May 14, and left, against the advice of the physician, but discovered he had not sufficiently recovered and returned to the hospital on May 16, for the same illness, and remained there until May 30.

On cross examination Dr. Storey described Mr. John C. Ball's condition when he treated him in April, 1952, as follows:

"Severe—very severe and unrelenting pain in the center of his chest, extreme weakness, a sharp decline in blood pressure as indicated by the subsequent return to normal or to his former level, by a rapid, threatly (sic), irregular pulse—in his case by nausea and vomiting, by great pallor, and as the process unfolded and manifested itself further by fever, by rise in his white blood cell count, and as a confirmatory measure by electro cardiographic changes which typify coronary thrombosis."

In response to this question by plaintiff's attorney, "Q. In your practice, Doctor, have you ever known anyone to recover from coronary thrombosis?", the Doctor stated: "Oh, yes. By recovery, I use the word recovery advisedly, they recover from the immediate disabling effects and they may heal up this damaged area and

carry on remarkably well for a number of years but they are always subject to further similar attacks and most have further similar attacks. They are never left in as sound and as good physical condition afterwards as they were before, rarely so."

In Dr. Storey's opinion insured had a severe attack, because of the extreme grade of shock, the extraordinary amounts of morphine and demerol which were given without complete relief from pain, the necessity of the use of an oxygen tent and the length of time necessary for recovery from the attack. When Mr. Ball left the hospital the second time he was out of immediate danger, but was not ready to resume gainful employment. He was by no means recovered and needed further convalescence. The electrocardiagraphic changes from normal indicated that the thrombosis occurred in the heart.

Dr. Ivan R. Elder testified he first saw and treated Mr. John C. Ball on January 21, 1955, and continued to treat him until his death on December 1, 1955. When first examined he complained of weakness, shortness of breath, particularly upon exertion. In Dr. Elder's opinion he was suffering from heart failure of the type technically referred to as congestive heart failure, which particularly involved the circulatory system supplying the lungs and "which we term right heart failure, because it is that side of the heart which pumps blood through the pulmonary circuit, resulting in a pooling of blood with consequent congestion in the lung fields." Part of his difficulty was due to a diffused scarring process in the lungs with dilation of air sacs, "which we technically term emphysema." He was treated for that to relieve the congestion which was overloading his heart, and later was placed on digitalis, which is a standard drug for use in congestive heart failure. He was admitted to the hospital October 27, 1955, through November 12, 1955, because of exhaustion of his heart and lung systems. He improved considerably and was in a convalescent state doing only part time selective work until the onset of a cold about November 27. He was seen on November 28 in acute distress and was again hospitalized on that day with a severe respiratory infection which increased the overload on his heart and lungs to the critical point. He continued in that state with gradual improvement under treatment until the first of December when he suddenly suffered the severe attack which resulted in his death. That attack, in the witness's opinion, was a coronary thrombosis with coronary occlusion. Dr. Elder was not present at the time of the attack or at the time of death. His opinion was drawn from the pattern and the opinion of the physician in attendance. He was in contact with him by telephone.

Dr. Elder testified he prepared the death certificate for the Georgia Department of Public Health, certified copy of which was introduced in evidence, in which the witness stated the disease or condition directly leading to death was coronary occlusion and that the antecedent causes were congestive heart failure of which the underlying cause was due to emphysema.

In Dr. Elder's opinion insured was not in sound health on August 26, 1955, which was the date of the application for the policy. "He at that particular time was in a fairly stable condition with reference to his disease but he was not able to fulfill the responsibilities of his work, and at that time it was necessary to see me at approximately weekly intervals, primarily due to complaints of shortness of breath and weakness or exertion and inability to carry out his program." Dr. Elder was not aware of insured's previous hospitalization and treatment by Dr. Storey for a coronary thrombosis until his final hospitalization. Insured had not informed him. In response to a hypothetical question which hypothesized his previous attack in 1952, and his condition as the witness described it at the time he was treating him in August and September

of 1955, "and assuming further that on September 12, 1955, a policy of life insurance was issued on his life, in your opinion, Doctor, would his health condition as it existed on that date increase the risk of loss on that policy", the witness answered: "I feel that assuming the prior condition as stated, in my opinion he was an increased insurance risk."

On cross examination Dr. Elder was asked if the statement in the death certificate that "death was due to a coronary occlusion due to a congestive heart failure due to emphysema", meant that the coronary occlusion was brought on by a lung condition. He replied: "Not in a direct causal sense. These forms (referring to the form of the death certificate) change from time to time. It would be more proper to say 'contributed to' than a direct causal relationship. The actual occurrence of coronary occlusion can't be directly predicated nor directly causally related to anything except disease of the coronary artery, but other things may precipitate the event, and congestive heart failure with slowing of the circulation will set up such a condition that an occlusion is more apt to occur at that time than in the presence of a normal circulation. It would be more proper on the form to say 'contributing to' and likewise with the emphysema listed below contributing to, but we are not allowed to change the form, we have to express ourselves as nearly correctly as we can within the limits of the form."

The witness defined emphysema as "a complex of scarring and stretching of the lung sacs which again is difficult to attribute to a single cause. Repeated congestion, repeated infection, and injuries of a diffused nature to the lung such as people who have chronic congestion or chronic asthma, lead to residual diffused scarring and damage to which term we apply emphysema." He would not state the lung condition was at the bottom of the whole difficulty, but said it was a contributing cause. He was asked to explain the difference between a coronary occlusion and a thrombosis, and stated occlusion simply means plugging of the vessel. Thrombosis is specifying the blocking was due to a clot. The doctor was then asked, "and you wouldn't say that his death was caused from coronary thrombosis, would you?", and replied, "I would make that assumption, yes." He stated he didn't see the clot, that he was in Atlanta at a medical meeting when insured died, and to his knowledge he never had a coronary occlusion while he was present.

The death certificate states his own diagnosis, based upon his own personal knowledge and examination of the patient, and from the pattern of death and in concurrence with the diagnosis of the doctor present.

Although not one of the types of fatal maladies of which the courts take judicial knowledge, such as "Tuberculosis, cancer and Hodgkin's disease", as materially increasing the risk of loss, New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 283, 143 A.L.R. 321. "There can be no doubt that heart trouble may be a serious disease. Sovereign Camp, W. O. W. v. Harris, 228 Ala. 417, 153 So. 870; Mutual Life Ins. Co. of New York v. Allen, 174 Ala. 511, 56 So. 568." Vredenburgh v. Liberty National Life Ins. Co., supra. [246 Ala. 251, 20 So.2d 211.]

In Aetna Life Insurance Co. v. Norfleet, 232 Ala. 599, 169 So. 225, 226, the court said: "True, opinion evidence is not conclusive on the court and jury, but when, as here, the opinion of an expert is based upon facts such as tests and personal examinations, as here, and when said evidence is uncontradicted, the defendant would be entitled to the general charge with the hypothesis."

The only evidence which tends in any way to contradict the experts here is as follows: "The plaintiff, Rex Ball, testified

he saw his brother frequently during 1955; that plaintiff worked at the Chevrolet place in Auburn, Alabama, and insured was a salesman at a used car place in Columbus, Georgia, and often sent prospective purchasers to plaintiff's place of business; that he looked healthy; that to the best of his knowledge insured was on the job every day; that he talked to him on the 'phone' sometimes twice a week and insured made no complaints about his health.

Mr. John Jordan, who was an employee of Jordan-Holmes Motor Company, as was deceased, testified he began work with the company in July 1955. Sales meetings were held each morning and, so far as he could remember, insured was present at these meetings. Also, Mr. Barber, defendant's agent who took the application for the policy, stated insured was in healthy looking condition at that time.

■ This testimony does not, in our opinion, contradict the evidence of the physicians whose opinions were "based upon facts such as tests and personal examinations." Aetna Life Insurance Co. v. Norfleet, supra.

Appellant insists that the testimony of the physicians as to the type of heart trouble with which insured was afflicted was in conflict, in that, Dr. Storey stated that in 1952 he made a diagnosis of coronary thrombosis, while Dr. Elder, in 1955 diagnosed his disease a congestive heart failure and emphysema; that Dr. Elder stated a thrombosis specifies the blocking is due to a clot and that he did not see a clot. Appellant argues, "The jury could have found as a fact that the clot seen by Dr. Storey three years earlier had dissolved."

We do not agree with this contention. Furthermore, if it be conceded, which we do not, that the evidence shows that Dr. Storey diagnosed a different type of heart trouble in 1952 to that diagnosed by Dr. Elder in 1955, we find "no conflict in the evidence as to the nature and character of the disease suffered by the insured and resulting in his death, and from which he was suffering when the policy was issued." Aetna Life Ins. Co. v. Norfleet, supra.

■ We are clearly of opinion the evidence established insured was suffering from a disease which materially increased the risk of loss when the policy was issued and that the court properly gave to the jury the general affirmative charge with hypothesis.

■ It was immaterial whether insured knew of the character or nature of his illness. Aetna Life Ins. Co. v. Norfleet, supra.

■ In his motion for new trial appellant urges that the trial court committed reversible error in its explanatory charge to the jury in giving the affirmative charge. No exception was reserved to the oral charge, and it cannot be reviewed. Lusk v. Wade, 259 Ala. 555, 67 So.2d 805; Sorrow v. Industrial Life & Health Ins. Co., 259 Ala. 544, 68 So.2d 43.

■ Appellant can take nothing in consequence of an erroneous conclusion inducing the trial court to give the general affirmative charge for the defendant, if the defendant was otherwise entitled to such instruction. Burke v. Curtis Aeroplane Motor Co., 204 Ala. 354, 85 So. 703.

Affirmed.

PER CURIAM.

Reversed and remanded on authority of Ball v. National Life and Accident Insurance Company of Nashville, Tenn., 118 So. 2d 724.