Sanders, Janet L., J.
This is an action seeking payment of proceeds under a life insurance policy issued by the defendant Savings Bank Life Insurance Company of Massachusetts (“SBLI”) to Charles Lamer, who died on May 1, 2002. The plaintiff Elise Larner (now Elise Hills) is his widow and the named beneficiary under the policy. The case is now before the Court on cross motions for summary judgment. At issue is the interpretation of a “good health” clause in the policy application. For the following reasons, this Court concludes that, as to Count II (alleging breach of contract) the plaintiffs Motion must be ALLOWED, and the defendant’s Motion DENIED. As to all remaining Counts, the defendant’s Motion is ALLOWED.
BACKGROUND
The undisputed facts material to these motions can be summarized as follows. In November 2001, Mr. Larner, then 50, applied for term life insurance with SBLI. Part One of the Application was filled out on November 8, 2001 with the assistance of Maureen E. Carney, an insurance agent associated with SBLI. The Application stated that Mr. Lamer had been laid off from his job at Polaroid, and was looking to “provide financial security for his wife and children,” who were named as the beneficiaries.[1] The amount of insurance applied for was $300,000. In a preprinted box on the second page of Part One of the Application, there appears the following language:
I agree that the insurance applied for shall not be effective until the later of the date that the first full premium is paid or the date the application is approved by SBLI, and only then if each person to be insured is in good health on such date.
(Emphasis in original.) There was no discussion at the time the Application was filled out concerning the meaning of the reference to “good health.” Carney told Mr. Larner only that the policy would become effective once the underwriter approved his application and he paid his first premium. It is undisputed, however, that as far as Mr. Larner or his family knew, he was in fact in good health when he executed this Application on November 21, 2001.
In order to satisfy itself that Mr. Lamer was indeed in good health, SBLI did two things. First, it dispatched a paramedic to Mr. Lamer’s residence to examine him. The paramedic measured his height and weight, took his blood pressure and pulse, and took blood and urine samples. The test results were all normal. The paramedic also asked Mr. Larner a number of questions concerning his health (as well as that of family members), and his responses to these questions were recorded in Part Two of the Application. Mr. Larner reported that he had last seen his physician in October 2001 for a complete physical examination, which was normal. He also stated that he took Prilosec and suffered from seasonal allergies. Otherwise, his responses indicated that he was in good health as far as he knew: he had never smoked, and had never been treated for or had any indication of rheumatism, cancer, bone disease, or any other serious disorder.' He had never been advised to reduce his consumption of alcohol nor had he consumed at any time any barbiturates, narcotics, or other habit-forming drugs. He did not suffer from any sexually transmitted diseases. He was not overweight.
The next thing that SBLI did was get Mr. Lamer’s medical records. There was nothing in these medical records to indicate to SBLI that Mr. Larner was not in good health. The records did show that Mr. Lamer had a long history of gastroesophageal reflux disease (“GERD”), and that he was taking Prilosec for this, as he had stated in the Application. He had seen his doctor last in the fall 2001, as he reported. The record of that visit (described as “routine”) stated that Mr. Larner “looks well,” and reported “running two to three miles a day” without difficulfy. The physician stated that there were “no major concerns” except for the “ongoing dyspepsia and GERD,” which had been treated with Prilosec.
On November 27, 2001, Mr. Lamer sent SBLI a check for the policy premium. There is no evidence that anything medically significant occurred for the next six weeks. On January 3, 2002, SBLI approved the Application and the policy issued a few days later. The insurance policy stated that it included the Application and any attached riders as part of the contract.
It also contained a provision stating that SBLI could contest or cancel the policy for any misrepresentation of fact in the Application. There is no claim in this case that Mr. Lamer made any misrepresentations to SBLI *673 or in any way gave it untrue information about his health as he perceived it.
On January 16, 2002, Mr. Lamer returned to his doctor after experiencing abdominal cramps the night before. Mr. Larner’s doctor referred him to Emerson Hospital for diagnostic tests, suspecting a possible kidney stone. An ultrasound instead showed “multiple hepatic lesions consistent with metastatic disease.” The next day, Dr. Dubois at Emerson performed a CAT scan which showed multiple lesions on Mr. Larner’s liver and a mass in his pancreas.
He was diagnosed with Stage IV pancreatic cancer, which is the highest level of severity and has a prognosis of survival which is less than a year. Mr. Lamer died on May 1, 2002.
Mr. Lamer’s wife Elise (the plaintiff) promptly submitted a claim to SBLI for death benefits. On June 19, 2002, SBLI denied the claim on the grounds that Mr. Larner could not have been in “good health” as of January 3, 2002 when his Application was approved. Citing the “good health” clause in the Application, SBLI took the position that the policy was void.
It issued the plaintiff a check for $827.28, representing the premiums paid as of that date.
This lawsuit ensued.
DISCUSSION
The issue before this Court is whether a beneficiary under a life insurance policy can be denied death benefits under a “good health” clause even where the insured did not know at the time that his application was approved that he was suffering from a disease which would ultimately prove to be fatal. The defendant contends that a long line of Massachusetts cases supports its position that the insured’s actual good health is a condition precedent to coverage which, if not satisfied, voids the policy even though the health problem was not known until after the policy issued. The plaintiff argues that the Court should interpret this clause from the perspective of the policy holder: if the insured reasonably believed that he was in good health at the time he applied for insurance, then the insurer should not be able to escape its obligations, particularly where it had satisfied itself as to the state of the insured’s health before it approved the application. Recognizing that the defendant has precedent on its side, this Court is nevertheless of the view that, if the Supreme Judicial Court were to confront this issue today, it would take the plaintiffs position. That is, clauses like the instant one must be interpreted based on what the parties knew and reasonably believed at the time the policy issued, and not on what in fact turned out to be the case based on discoveries made sometime later.
This Court begins its analysis with certain principles in mind. The interpretation of an insurance contract is no different from the interpretation of any other contract: if a provision is free from ambiguity, then the Court must give the words their usual and ordinary meaning. Cody v. Connecticut General Life Insurance Co., 387 Mass. 142, 146 (1982), quoting MacArthur v. Massachusetts Hospital Service Inc., 343 Mass. 670, 672 (1962). Where there are equally plausible interpretations of the policy language, however, then “the insured is entitled to the benefit of the one that is more favorable to it.” Trustees of Tufts University v. Commercial Union Insurance Co., 415 Mass. 844, 849 (1993), quoting Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 700 (1990). This makes particularly good sense since the insurer generally drafts the policy language; it is therefore within its power to make clear its intentions and to alleviate any confusion on the insured’s part. Finally, it is appropriate for the Court to consider whether an objectively reasonable insured, reading the relevant policy language, would expect to be covered. Hakim v. Massachusetts Insurer’s Solvency Fund, 424 Mass. 275, 282 (1997); see also City Fuel Corp., v. National Fire Insurance Co of Harford, 446 Mass. 638 (2006). This Court applies these principles in weighing the arguments of the parties.
SBLI contends that Mr. Larner’s good health was a condition precedent to the formation of a contract of insurance. As a condition precedent as opposed to a representation, “good health” (it is argued) means actual good health; the insured’s state of mind is totally irrelevant. Certainly, there is support for this position in the case law, although most of these decisions date back to the late nineteenth and early twentieth centuiy. See e.g. Fondi v. Boston Mutual Life Insurance Co., 224 Mass. 6, 7 (1916); Barker v. Metropolitan Life Insurance Co., 188 Mass. 542, 546 (1905); Gallant v. Metropolitan Life Insurance Co., 167 Mass. 79 (1896); see also Ansin v. Mutual Life Insurance Co. of New York, 241 Mass. 107, 110 (1922). If the Court were to use this analysis, then SBLI would prevail: there can be no dispute that Mr. Lamer was suffering from pancreatic cancer as of January 3, 2002, the date the insurance policy issued.[2]
Although SBLI does have Massachusetts precedent on its side, more recent decisions interpreting “good health” clauses are not quite so clearly on point or are readily distinguishable. Thus, in Krause v. Equitable Life Insurance, 333 Mass. 200 (1955), the policy not only required that the insured be in good health at the time the policy issued but contained the further requirement that the insured shall not have received any medical treatment after the insurer’s doctor examined him. Following the examination, the insured collapsed from what appeared to be a heart attack and was treated by a doctor — facts he did not disclose to the insurer before his application was approved. In Warren v. Confederate Life Ass’n, 401 F.2d 487 (1st Cir. 1968), the insured warranted in his application that he was “in first class good health and free from all symptoms of disease” when in fact, unknown to the insurer, he *674 had been hospitalized several times for the ingestion of drugs and for seizures. In Connolly v. John Hancock Mutual Life Insurance Co., 322 Mass. 679 (1948), the trial court erred by simply presuming that the insured was in good health because he was alive at the time the policy was to take effect. The question of whether the insured knew or had any reason to know that he was not in good health was not discussed at all. See also Shurdut v. John Hancock Mutual Life Insurance Co., 320 Mass. 728 (1947).
Clearly, these more recent cases are quite different from the case before this Court. First, the Application does not attempt to define “good health,” in contrast, for example, to the clause in Warren (“first class good health” and “free from all symptoms of disease”). Second, in contrast to the facts in Krause, there is no evidence that Mr. Larner received any medical treatment (or even that his physical status changed in some way) between the time he saw the paramedic in November 2001 and the date when he was diagnosed with cancer. There is therefore no basis to find that a change in circumstances occurred which should have been disclosed to SBLI. Finally, is undisputed that Mr. Larner truthfully represented the state of his health as he knew it to be on November 2001 and had no knowledge that he had cancer until after the policy issued. The instant case thus lacks that element of misrepresentation which has moved many courts to enforce the good health clause so as to deny any coverage. See e.g. Pagnotti v. Savings Bank Life Insurance Co. of Massachusetts, C.A. No. 02-00922 (Brockton Superior Court) (Giles, J.).
In attempting to predict what the Supreme Judicial Court would do with this case if confronted with it today, I look to the state of the law in other jurisdictions. As best this Court can determine, the states are almost evenly divided, with approximately twenty adopting the position advocated by SBLI,[3] and around seventeen favoring a position closer to that proposed by the plaintiff.[4] The Massachusetts approach has been pronounced by courts in the latter group to be “harsh.” See e.g. Brubaker v. Beneficial Life Insurance Co., 130 Cal.App.2d 340, 345 (1955) (applying California law). In those states which have upheld coverage even where the insured was not in fact in good health at the time the policy issued, one can discern certain common themes or core facts which moved the court to the decision that was ultimately reached. They include the following.
First, courts have given considerable weight to whether the insurer required the insured to undergo a medical examination. These courts reasoned that, in issuing the policy after such an examination, the insurer had effectively waived the ability to cancel a policy based on a condition which neither the insurer nor the insured detected beforehand. See e.g. Combs v. Equitable Life Ins. Co. of Iowa, 120 F.2d 432, 435 (4th Cir. 1941) (applying Virginia law); see also Wanshura v. State Farm Life Ins. Co., 275 N.W.2d 559 (1978) (applying Minnesota law). Where the insurance company determines the nature, scope and extent of the medical examination that the insured must submit to as a condition of coverage, then the insurance company should not be able to take advantage of any shortcomings in such an examination by voiding the policy retroactively under the “good health” clause once a disease which could have been detected eventually manifests itself. Ortega v. North American for Life & Health Ins., 187 Neb. 569, 573 (1971). Under this reasoning, it should not matter whether the examination was conducted by a doctor or a paramedic (as was true in the instant case). The insurance company could have reduced its risk by requiring a more extensive examination. Having settled for less (at a reduced cost to it), it bears the risk if a condition then comes to light which neither the insured nor the insurer were aware of at the time the policy issued.
This approach also makes sense when one considers the situation from the standpoint of the insured. As the Pennsylvania Supreme Court noted, the applicant who “passes” a medical exam “is certainly justified in assuming, in the absence of fraud or misrepresentation on his part, that the company has satisfied itself as to his state of health, and that he can rest confident in the belief that he has obtained a valid policy of insurance upon his life.” Prudential Ins. Co. v. Kudoba, 323 Pa. 30, 35 (1936). Absent some evidence that the insured’s health status markedly changed after such an examination and prior to the delivery of the policy, the insured should be able to rely on the results of the examination which the insurer essentially held out as the standard by which “good health” would be measured. See Sherman v. Mutual Life Insurance Co., 447 Pa. 442, 449 (1972) (noting that a change in health after the examination could be a reason to deny coverage even after the insured was given a clean bill of health). In the instant case, it is fair to say that Mr. Larner quite reasonably expected that he had been determined by SBLI to be in “good health” once he released his medical records (showing a normal examination by his own doctor), and after no problems surfaced in tests run by the paramedic whom SBLI had hired. Unless his health changed for the worse between the time of the Application and the date the policy issued (and there is no evidence of that), there would be no reason for these expectations to change.
A second rationale for these decisions favoring coverage even in the absence of the insured’s actual good health is the inevitable gap in coverage which would result if insurers could void a policy retroactively based on a condition which manifests itself some time after the policy issued. As the court noted in Kudoba, “no one would ever know if he were insured or not, even though he has passed a medical examination and received a policy.” 323 Pa. at 35. People buy insurance to protect their family’s financial future. If one insurer *675 turn them down, they have the option of applying to another. Where the insurer accepts their money and issues the policy, however, then there is no reason to seek coverage elsewhere. It hardly seems fair to allow the insurance company to go back on that decision when it discovers sometime after delivery of the policy that the risk .that the insured sought protection against (namely, his untimely death) can be traced back to some latent condition which no one knew about when the application for insurance was first made. See e.g. Bronx Savings Bank v. Weigandt, 1 N.Y.2d 545, 553 (1956) (stating that it would be unfair to rescind a life insurance policy by interpreting the good health clause in a way which the reasonable insured would not have understood it). See also National Life & Accident Insurance Co. v. Martin, 35 Ga.App. 1 (1926); Kudoba, 323 Pa. at 34-35.
Apart from the approach taken in these other states, this Court also finds support for plaintiffs interpretation in the fact record before this Court, including testimony from representatives of SBLI itself. Thus, the insurance broker who sold Mr. Lamer the policy testified that she understood the reference to “good health” to mean that Mr. Lamer was certifying that he had no knowledge of any medical illness or condition impairing his health. See Deposition of Maureen E. Carney, at pp. 25-27. SBLI’s Director of Brokerage agreed that a reasonable insured could understand “healthy” to mean “free of any known serious illnesses.” See Deposition of Dennis Clifford at p. 44. SBLI’s underwriter described the issue of “good health” in terms of risk: in deciding whether to approve a policy application, he would review medical records and the medical findings from the examination to determine if the applicant was an “acceptable risk.” See Deposition of William Ventola, pp. 55-56; see also Affidavit of Steven Rudnyai (describing his communications with SBLI concerning the meaning of the “good health” clause). Here, Mr. Larner’s application was approved: that is, knowing of his GERD problem, and having the results from both its own examination and that of Mr. Larner’s personal physician, SBLI accepted Mr. Lamer as he was as of the date the policy issued. He was in effect deemed to be insurable by SBLI’s own standards.
Finally, this Court returns to the principles that it cited at the beginning. The term “good health” (notwithstanding SBLI’s assertion to the contrary) is not one which is free from ambiguity. See Friez v. National Old Line Ins. Co., 703 F.2d 1093, 1095 (9th Cir. 1983) (concluding that “good health” could mean either “objective good health” or “apparent good health,” and adopting, under Montana law, that meaning which favored the insured). As the New York Court of Appeals held in Weigandt, supra, that ambiguity is not eliminated by simply calling “good health” a condition precedent rather than a representation. Although “an insurer is entitled to protect itself against risks it does not wish to take... it must manifest its intent to exclude such risks in clear, unequivocal terms.” Weigandt, 1 N.Y.2d at 553. Where it fails to do so, the Court should interpret the term based how the average person in the insured’s position would understand it. This is not just a question of contract law but of fairness. To interpret the policy contrary to the reasonable expectations of the insured so as to rescind it at a time when it is too late for the insured to seek insurance elsewhere would be “manifestly unjust.” 1 N.Y.2d at 553.
Having accepted the plaintiffs position with regard to the meaning of “good health,” all the Court must still consider with regard to the breach of contract count is whether there is any question of fact which would make summary judgment for the plaintiff inappropriate. This Court concludes that no such fact issue exists. As already noted, SBLI concedes that the Mr. Lamer did not know that he had cancer until after the policy issued. Furthermore, there is no evidence that he had any reason to know that his health was any different on January 3, 2002 than it was on November 21, 2001: there is no indication that there was any change in circumstances, or that Mr. Lamer came into possession of information about his health between those dates which he should have disclosed to SBLI. His good faith is not questioned. In opposing the plaintiffs summary judgment motion, SBLI does not argue that there is a material fact issue. Rather, it makes the straightforward argument that plaintiffs interpretation of the good health clause is wrong as a matter of law.
Although this Court accepts plaintiffs interpretation of the insurance contract, the plaintiff is not entitled to pursue her claims seeking relief on theories other than breach of contract.[5] In Count VII, plaintiff asserts a violation of G.L.c. 93A and G.L.c. 176D. Where the interpretation of policy language is an issue of first impression, however, there is no violation of 93A. City Fuel Corp., 446 Mass. at 644. Here, this Court is not only striking out into new territory but is diverging from existing precedent. Clearly, SBLI’s interpretation of the “good health” clause is not so unreasonable as to constitute an unfair and deceptive practice. Plaintiff will likewise be unable to make out a claim for either intentional infliction of emotional distress (Count IV), since that requires outrageous conduct on the part of the defendant, or of negligent infliction of emotional distress (Count VI), there being no evidence of negligence or of physical harm to the plaintiff manifested by objective symptomalogy. Payton v. Abbott Labs, 386 Mass. 540, 555-57 (1982). This is a breach of contract case and nothing more. The defendant is thus entitled to summary judgment on the plaintiffs remaining claims. With a final judgment to enter, the parties are thus free to test this Court’s legal conclusions by seeking appellate review.
*676 CONCLUSION AND ORDER
For all the foregoing reasons, the plaintiffs Motion for Partial Summary Judgment on Counts II alleging a breach of contract claim is ALLOWED and the Defendant’s Motion for Summary Judgment on that claim is DENIED. As to the remaining counts, the Defendant’s Motion is ALLOWED. It is hereby ORDERED that judgment enter for the plaintiff on Count II after a hearing to assess damages on that count, which should be scheduled promptly. Such damages shall be limited to that amount of money which the plaintiff would have received if her claim for death benefits had been honored; it should not include any amount for attorneys fees or costs. Counts I and III through VII are DISMISSED, with prejudice.

Mr. Lamer was not alone in seeking life insurance for his family during this period. As his insurance broker testified at her deposition, there was a dramatic surge in the number of people applying for life insurance in the fall of 2001, after September 11.

When the cancer was diagnosed January 16, 2002, it was in an advanced stage. If common sense were not enough to compel the conclusion that this cancer had its onset well before January when the policy issued, the defendant has submitted the affidavit of an oncologist supporting that conclusion. The plaintiff has submitted no opposing affidavit so as to raise a triable issue on this point.

Those states are as follows: Alabama, Arizona, Connecticut, Florida, Indiana, Kansas, Massachusetts, Michigan, Missouri, New Hampshire, New Jersey, North Carolina, North Dakota, Ohio, South Carolina, Texas, Tennessee, Vermont, Washington, and Wisconsin. Ball v. National Life & Acc. Ins. Co. Nashville, Tenn., 40 Ala.App. 593 (1960) (reversed on other grounds); Sovereign Camp, W.O.W. v. Daniel, 48 Ariz. 479 (1936); Kelly v. John Hancock Mut Life Ins. Co., 131 Conn. 106 (1944); Life Ins. Co. of North America v. Cichowlas, 659 So.2d 1333 (1995); Western & Southern Life Ins. Co. v. Persinger, 101 Ind.App. 522 (1936); Klein v. Farmers’ & Bankers’ Life Ins. Co., 132 Kan. 748 (1931); Krause v. Equitable Life Ins. Co. of Iowa, 333 Mass. 200 (1955); Ogilvie v. Inter-Ocean Ins. Co., 12 Mich.App. 652 (1968); Prince v. Metropolitan Life Ins. Co., 235 Mo.App. 168 (1939); Perkins v. John Hancock Mut Life Ins. Co., 100 N.H. 383 (1956); Barrase v. Metropolitan Life Ins. Co., 12 N.J.Misc. 631 (1934); Huffman v. State Capital Life Ins. Co., 8 N.C.App. 186 (1970); Thompson v. Travelers' Ins. Co., 13 N.D. 444 (1904); Metropolitan Life Ins. Co. v. Howie, 62 Ohio St. 204 (1900); United Ins. Co. of America v. Stanley, 277 S.C. 463 (1982); American Nat. Ins. Co. v. Navarette, 758 S.W.2d 805 (1988); De Ford v. National Life & Acc. Ins. Co., 185 S.W.2d 617 (1945); Grover v. John Hancock Mut. Life Ins. Co., 119 Vt. 246 (1956); Logan v. New York Life Ins. Co., 107 Wash. 253 (1919); Clark v. Prudential Ins. Co. of America, 219 Wis. 422 (1935); Mutual Trust Life Ins. Co. v. Ossen, 77 F.2d 317 (2nd Cir. 1935) (applying New York law); Assurity Life Ins. Co. v. Grogan, 480 F.3d 743 (5th Cir. 2007) (applying Texas law); Continental Illinois Nat. Bank & Trust Co. of Chicago v. Columbian Nat. Life Ins. Co., 76. F.2d 733 (7th Cir. 1935) (applying Illinois law); Security Ben. Life Ins. Co. v. Jackson, 318 F.2d 846 (8th Cir. 1963) (applying Missouri Law).

Those states are as follows: Arkansas, California, Georgia, Illinois, Iowa, Kentucky, Minnesota, Mississippi, Montana, New York, New Mexico, Nebraska, Oklahoma, Oregon, Pennsylvania, Rhode Island, and Virginia. Aetna Life Ins. Co. v. Mahaffy, 215 Ark. 892 (1949); Metropolitan Life Ins. Co. v. Devore, 66 Cal.2d 129 (1967); Life & Cas. Ins. Co. of Tenn. v. Truett 112 Ga.App. 338 (1965); Cox v. Equitable Life Assur. Soc. of U.S., 333 Ill.App. 207 (1948); Mickel v. Mutual Life Ins. Co. of New York, 213 N.W. 765 (1927); Kentucky & Southern Life Ins. Co. v. Downs, 301 Ky. 322 (1946); Wanshura v. State Farm Life Ins. Co., 275 N.W.2d 559 (1978); Fidelity Mut. Life Ins. Co. v. Elmore, 111 Miss. 137 (1916); Williams v. Union Fidelity Life Ins. Co., 329 Mont. 158 (2005); Ortega v. North Am. Co. for Life & Health Ins., 187 Neb. 569 (1971); Bronx Sav. Bank v. Weigandt, 1 N.Y.2d 545 (1956); Jackson Nat. Life Ins. Co. v. Receconi, 113 N.M. 403 (1992); Mid-Continent Life Ins. Co. v. House, 156 Okla. 285 (1932); Mutual Life Ins. Co. of New York v. Muckier, 143 Or. 327 (1933); Sherman v. Security Mut. Life Ins. Co. of New York, 447 Pa. 442 (1972); Madsen v. Metropolitan Life Insurance Company, 90 R.I. 176 (1959); Greenwood v. Royal Neighbors of America, 118 Va. 329 (1916); Combs v. Equitable Life Ins. Co. of Iowa, 120 F.2d 432 (4th Cir. 1941) (applying Virginia law); Friez v. National Old Line Ins. Co., 703 F.2d 1093 (9th Cir. 1983) (applying Montana Law).

Count I seeks declaratory relief. The plaintiffs remedy is a legal one in the form of damages, however. Count III alleges a breach of the covenant of good faith and fair dealing. Having already concluded that SBLI breached a contractual term, this court sees this Count as duplicative. There is no Count v. in the Complaint.