Wilkins, Douglas H., J.
Plaintiff, Central Mutual Insurance Company (“Central”) brought this declaratory judgment action to establish the presence or absence of coverage under a Comprehensive General Liability (“CGL”) insurance policy (“Policy”) issued to the defendant, True Plastics, Inc. (“True”) for an injuiy at True’s workplace suffered by the defendant, Marciala Sanchez. The Court received seven exhibits as a case stated on November 17, 2011, and heard oral arguments on November 22, 2011. The parties have submitted written requests for findings and rulings. Upon consideration of the evidence and arguments, the Court finds for the defendant and enters a declaration accordingly.
BACKGROUND
Stipulated Facts
The parties have stipulated to the following facts, which I find are true.
1. True Plastics, Inc. (“True Plastics”[1]) is a Massachusetts corporation engaged in the manufacture of plastic components for its customers.
2. At all relevant times, True Plastics’ workforce consisted of persons directly employed by the company, as well as labor from one or more staffing companies, including Dynamic Staffing, Inc.
3. Dynamic Staffing is in the business of placing its employees at client companies in order to support the work forces of those companies.
4. On September 27, 2004, Marciala Sanchez, an employee of Dynamic Staffing, Inc., started working at True as a machine operator.
5. On October 14, 2004, Marciala Sanchez was injured while working as a machine operator on the premises of True Plastics.
6. Dynamic, not True Plastics, was responsible for paying Sanchez and withholding the worker’s unemployment taxes and other taxes (e.g., state and federal taxes, social security, FICA) from Sanchez’s paycheck.
7. True Plastics was also relieved from paying taxes to the Massachusetts Department of Revenue for workers supplied by Dynamic because these workers, including Sanchez, were not on True Plastics’ payroll.
8. The agreement between Dynamic and True Plastics also makes Dynamic responsible for all workers’ compensation claims made by the worker that Dynamic supplies to the client company arising out of an accident at the client company.
9. Dynamic’s workers’ compensation policy covers such claims and Sanchez filed a claim under the policy and received benefits for the injuries sustained on October 14, 2004.
10. Dynamic paid all of the premiums on the workers’ compensation policy under which Sanchez filed her claim.
11. Central Mutual Insurance Company issued Commercial Policy Number CLP7989942, effective January 1,2004 to January 1, 2005, to True Plastics, Inc. d/b/a Holden Plastics as named insured. This policy provided commercial general liability coverage through Form CG 00 01 10 01, which provided, in pertinent part, as follows:
COMMERCIAL GENERAL LIABILITY COVERAGE FORM
Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.
****
Other words and phrases that appear in quotation marks have special meaning. Refer to Section V— Definitions.
SECTION I — COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY 1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of “bodily injuiy” or “property damage” to which this insurance applies. We will have the right and duty to defend the insured against any “suit” seeking those damages. However, we will have no duty to defend the insured against any “suit" seeking damages for “bodily injury” or “property damage” to which this insurance does not apply.
* * **
2. Exclusions
This insurance does not apply to:
e. Employer’s Liability “Bodily injuiy” to:
1) An “employee” of the insured arising out of and in the course of:
a) Employment by the insured: or
b) Performing duties related to the conduct of the insured’s business; or
2) The spouse, child, parent, brother or sister of that “employee" as a consequence of 1) above.
This exclusion applies:
1) Whether the insured may be liable as an employer or in any other capacity; and
2) To any obligation to share damages with or repay someone else who must pay damages because of the injuiy.
This exclusion does not apply to liability assumed by the insured under an “insured contract.”
SECTION V — DEFINITIONS
5. “Employee” includes a “leased worker.” “Employee” does not include a “temporary worker.”
*217 10. “Leased worker” means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. “Leased worker” does not include a “temporaiy worker.”
****
19.“Temporaiy worker” means a person who is furnished to you to substitute for a permanent “employee” on leave or to meet seasonal or short-term workload conditions.
****
12. By complaint filed on or about May 18, 2005 in the Worcester Superior Court, the defendant, Sanchez, sought compensatoiy damages from Holden Plastics Corporation, as a result of the events that occurred on October 14, 2004. The defendant’s name in that action has been amended to True Plastics, Inc. d/b/a Holden Plastics Corporation.
Additional Facts
I find the following additional facts by a preponderance of the credible evidence.
True Plastics, Inc.
13. David True and his ex-wife, Deborah True, incorporated True in December 2001 to engage in the sale and manufacture of plastic products.
14. David True worked at True from the date of incorporation.
15. He worked at Holden Plastics at the same address as a moldmaker, engineer and general manager for five years before he bought True.
16. His purchase of True included the book of business. Some of True’s customers remained with True after David True bought the company.
17. True worked on a contract basis and has no products of its own. Customers generally initiated contact with True by placing an order for a plastic part that is unique to the customer and selecting the deliveiy date for the completed order.
18. True then ordered the raw materials and arranged for the necessary labor.
19. True has had both full-time and part-time employees and has used labor from employment agencies, including Dynamic Staffing, Inc. (“Dynamic Staffing”) and Central Massachusetts Transit, Inc. At the time of the accident, it generally employed eight to twelve full-time employees and two part-time employees. It generally attempted to utilize direct employees to perform labor, although use of labor from staffing agencies was also a general and consistent practice at the relevant time, particularly when its full-time and directly employed workers were occupied filling existing orders.
20. It has used labor from staffing companies in 2001, 2002, 2003 and 2004.
21. Sometimes, it requested labor from staffing agencies on a weekly basis.
22. True cannot control the timing of customers’ new orders.
23. When determining whether a temporary worker is needed to fill a given order, David True considered the amount of labor required to fill the order, the deadline for completing the order, the availability of True’s direct employees to meet the deliveiy date and the demand for the labor of its direct employees to meet existing orders.
24. If a large order came in, which existing employees could not fill on time, True would call an employee leasing company and put an extra worker on that job.
25. True has operated on a single shift per day basis since 2001.
26.Based upon these facts and the prevailing business incentives, I infer that True managed its varying workload by (a) maintaining its own employee work force, which it could (and largely did) keep busy and (b) relying upon temporary workers to handle peak demands beyond the capacity of its own employees. It knew that such peaks would occur and that it would need to use temporaiy workers on a regular basis.
27.In 2004, True used hours of temporaiy staffing labor as follows.[2]
Month Hours of staffing labor
January 276.5
February 232.25
March 217.25
April 268.5
May 296.75
June 364.5
July 416.75
August 565
September 211
October 547.5
November 535.5
December 404.5
28.While one year’s worth of data may not establish a long-term trend, it does appear that True’s baseline need for temporary labor was between about 200 and 300 hours in 2004. The October and November hours substantially exceed 500 hours and are among the highest recorded in 2004, surpassed in only one other month (August 2004).
29.The hours used by leased labor are not necessarily determinative, as the hours reflect time actually worked, rather than the short-term workload conditions themselves. In particular, hours may be affected by vacations, terminations, machinery availability or malfunctions and a number of circumstances not relevant to the determination of short-term workload conditions.
30.Where, as here, True was ultimately unable to fill the Flexhead orders on time with the staff it assigned to the job, the “hours of staffing labor” in October and November 2004, actually underestimate the true labor demand resulting from the short-term workload conditions after receipt of the September 24, 2004 order.
*218 31. Nevertheless, the hours that staffing labor worked are of some assistance in assessing whether the need for Ms. Sanchez’s labor resulted from a long-term business pattern, or short-term conditions. I find that the data provide some support for the conclusion that the FlexH-ead order of September 24, 2004 created a short-term workload condition requiring her services.
Dynamic Staffing, Inc.
32. Dynamic Staffing, Inc. was a labor leasing firm.
33. It provided employees to serve as short-term replacements for a regular employee of a company who was on leave or absent from work. Dynamic Staffing employees also could supplement a client company’s skill shortage, perform special projects and serve as seasonal employees.
34. Its employees can, on occasion, be placed at a client company long-term or become full-time employees of a client company.
35. Dynamic Staffing earned a profit by sending its customers, including True, a weekly bill. The bill charged the customer a premium above the worker’s rate of pay, withholding taxes and workers’ compensation costs.
36. Once provided to True, workers furnished by Dynamic Staffing were expected to work 40-hour weeks and were under True’s control regarding training, supervision and the type of work they would perform. True also had the right to terminate the worker’s assignment to work at its facility.
37. Sometimes, True asked Dynamic Staffing for labor because of a single job. On other occasions, the need was not limited to one job.
38. The longest time that any Dynamic Staffing employee has worked continuously at True is five to six months.
The Flexhead Order
39. On September 20, 2004, Flexhead, Inc. (“Flexhead”) placed a phone order for 4,000 plastic parts for sprinkler heads to be delivered as soon as possible. True received a written purchase order number 0006897 dated September 24, 2004 for the same quantity.
40. Flexhead was a regular customer of True at the time of the relevant order. True held a parts inventory for Flexhead, which the record does not quantify.
41. Although the record does not state when that relationship began, invoices from Flexhead Industries to Holden Plastics date back to October 12,2000, although the next oldest invoice in the record is dated July 1,2002.
42. Prior purchase orders from FlexHead included in the record requisitioned 960 units (10/12/00), 416 units (7/1/02), 86 units (7/19/02), 200 units (8/28/02), 512units (5/1/03), 1,506units (5/30/03), 832 units (6/5/03), 352 units (11/20/03), 256 units (12/12/03), 256 units (12/29/03), 146 units (1/19/04), 192 units (2/17/04), 192 units (3/9/04), 224 units (3/15/04), 224 (3/18/04), 228 units (4/21/04) and 228 units (5/12/04), increasing to 1,000 (7/8/04) and 1,500 (7/13/04).
43. Some of these orders, including the latter two relatively large orders,[3] are not mentioned in True’s proposed findings, but the omissions do not materially change the analysis whether the September 24, 2004 order, in combination with outstanding back orders, created short-term workload conditions. Given these discrepancies, I do not take the compilation of Flexhead purchase orders as complete, but they are illustrative of the larger trend.
44. All or substantially all of the Flexhead orders stated the same “required date” as the order date.
45. In September 2004, True was still trying to fill Flexhead’s order for 500 units, dated August 12,2004. It was also attempting to fill two other contract orders from Raytheon and Sigma, for 12,500 units to be delivered on June 30, July 20, August 30 and September 30, 2004.
46. David True determined that True’s own employees were occupied filling these existing orders. He determined that he needed a temporary worker to serve as a molder for the Flexhead job. He estimated that the worker would need to work six to seven weeks on that job. The job was about half complete when Ms. Sanchez was injured. That roughly corroborates Mr. True’s testimony about his expectations.
Assignment of Ms. Sanchez to True Plastics
47. To meet his production requirements, David True called Dynamic Staffing to request assignment of an employee to True.
48. On September 27, 2004, Dynamic Staffing furnished Ms. Sanchez to True under a prior oral agreement between True and Dynamic, to perform duties related to the conduct of True’s business.
49. She did not fill in for any regular employee at True.
50. At the time, three other Dynamic Staffing Employees were working at True. They had been working for True for nine, fifteen and twenfy-eight weeks, respectively.
51. Under the agreement with True, Dynamic Staffing was to pay Ms. Sanchez $8.00 per hour and then bill True at a rate of $11.20 per hour.
52. Dynamic Staffing and True had no understanding concerning how long Ms. Sanchez would work at True, other than that she would work until no longer needed.
53. Dynamic Staffing had no knowledge whether Ms. Sanchez was needed to meet seasonal or short-term workload conditions at True.
54. In light of the prior history with other Dynamic Staffing employees and the inconclusiveness of the discussions between the parties, I do not find that True and Dynamic Staffing specifically expected Ms. Sanchez’ assignment to be terminated upon completion of the FlexHead order (although they understood that it might be advisable to do so, once the order was *219 filled). Nor do I find that they expected her to be assigned “indefinitely,” in the same sense as a permanent at-will employee.
55. Rather, the parties understood that there was an existing need for Ms. Sanchez to fill at the time of assignment, and that she would no longer work at True when there was no longer a need — whether the need vanished upon completion of the FlexHead order or continued thereafter due to some intervening facts. The assignment was indefinite only in the sense that the duration was undefined. Indeed, it would make little business sense for the parties to limit their flexibility in that regard.
56. There is no credible evidence that the parties specifically considered the issues raised by the employee exclusion or that they tailored their arrangement to evade that exclusion.
57. The post-accident statements of David True (and to a lesser extent, Dynamic Plastic’s witness, Michael Howe) are only partly credible, given their incentive to cast the arrangement in a favorable light when considering the employee exclusion. I therefore rely upon their testimony only to the extent they support the above findings.
The Accident
58. Ms. Sanchez began work a few days before the raw material for the Flexhead order arrived, so that she could learn how to operate a molding machine.
59. At some point, she worked on machines for projects unrelated to the Flexhead purchase order of September 24.
60. Once the Flexhead raw material arrived, Ms. Sanchez worked as a molder exclusively for the September 24, 2004 Flexhead order.
61. She worked at True for 13 days: September 27, 28, 29 and 30 and October 1, 4, 5, 6, 7, 8, 12 13 and 14, 2004.
62. True shipped its first installment of finished product to Flexhead on September 28, 2004 and continued shipping product to Flexhead in piecemeal fashion.
63. At the time of the accident, Ms. Sanchez was working on a compression molding machine manufacturing sprinklers for a fire suppression system for the Flexhead Industries purchase order of September 24, 2004.
64. David True notified True’s workers’ compensation insurer about Sanchez’s accident.
65. The insurer told Mr. True that the claim would be covered under Dynamic Staffing’s workers’ compensation insurance policy.
66. Dynamic Staffing’s workers’ compensation insurer accepted Ms. Sanchez’s workers’ compensation claim and has paid her benefits.
67. David True also notified Central Mutual about the accident and supplied information to support his claim that Ms. Sanchez was there to meet short-term workload conditions.
68. Ultimately, True failed to fill the September 24, 2004 Flexhead order with sufficient product within the customer’s deadline.
69. As a result of its inability to deliver sufficient product by the deadline, True lost Flexhead as a customer.
DISCUSSION[4]
A. Governing Principles of Construction
The coverage dispute in this case turns upon the terms of Central Mutual’s insurance policy, which, if unambiguous, are to be construed according to their plain, ordinary meaning. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 280 (1997); Somerset Savings Bank v. Chicago Title Ins. Co., 420 Mass. 422, 427 (1995); Sullivan v. Southland Life Ins. Co., 67 Mass.App.Ct. 439, 442 (1996). If a policy contains exclusion provisions that are plainly and definitively expressed, the exclusions must be enforced in accordance with their terms. Finn v. Nat’l Union Fire Ins. Co. of Pittsburgh 452 Mass. 690, 695 (2008). On some questions (such as whether the worker must be furnished by a third party), the leased worker exclusion and the related definitions of “employee,” “leased worker” and “temporary worker” are unambiguous. Monticello Ins. Co. v. Dion, 65 Mass.App.Ct. 46, 47 (2005).
Where the policy language leaves room for construction, exclusions from insurance coverage are to be strictly and narrowly construed. City Fuel Corp. v. Nat’l Fire Ins. Co. of Hartford, 446 Mass. 638, 643 (2006); Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 281-82 (1997). When in doubt, the Court must “consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.” Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844, 849 (1993), quoting Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 700 (1990). Any ambiguity in undefined terms (such as “short-term workload conditions”) is construed strictly against the insurer. Interstate Gourmet Coffee Roasters, Inc. v. Seeco Ins. Co., 59 Mass.App.Ct. 78, 83 (2003).
In any event, the insurance policy must be construed “as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” Sullivan, 67 Mass.App.Ct. at 442.
This case involves an exception to an exclusion. The parties agree that the insurer has the burden of proving that an exclusion applies. Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 231 (1997). They part company on whether the insured has the burden of proving that the facts fall within an exception to the exclusion. See Mass. Property Ins. Underwriting Assoc. v. Wynn, 60 Mass.App.Ct. 824, 825-26 (2004) (burden of proving exception to an exclusion is on the insured). The burden *220 of proof is ultimately irrelevant, as the Court finds that both sides have advanced sufficient evidence to support their positions on the facts. I decide the case without relying upon the allocated burden of proof.
B. The Context
The court begins by considering the policy’s language in context. As a general matter, commercial general liability (“CGL”) policies exclude employees from coverage because the employers are expected to have separate workers’ compensation insurance, as required by law. Leasing agencies must have workers’ compensation insurance for their employees. G.L.c. 152, §25A. Since leased employees are covered by their agency’s workers’ compensation policies, CGL policies commonly exclude “leased employees” from coverage. Dion, 65 Mass.App.Ct. at 49-50.
Why the policy excepts from this exclusion those workers who are “furnished to meet short-term workload conditions” is far less clear. The Appeals Court in Dion itself (at id.) expressed uncertainty on a similar issue (why the policy requires that the leased worker be “furnished” to the insured). It noted that it “is possible” that the “policy concept of ‘temporaiy worker’ mirrors the workers’ compensation insurance concept of the ‘loaned employee,’... as to whom, under the common law, the obligation to provide workers’ compensation coverage passed from” the leasing company to the insured. Id., 65 Mass.App.Ct. at 49 (citations omitted). Again noting the “possible,” the Court stated that the “temporaiy worker” exception “may have been intended as gap coverage to protect the . . . CGL insured where the furnishing employer may lack coverage.” Id., 65 Mass.App.Ct. at 50 (citations omitted). This historical analysis suggests some tolerance for duplicative recoveries, since the furnishing employer may (as here) actually have workers’ compensation coverage. It does not, however, explain why the “temporaiy worker" exception persists in modem CGL policies.
Since the policy language appears to follow model language drafted for nationwide use by the Insurance Services Office, it may be impossible to find an answer that makes sense in all regards in Massachusetts. See Steven P. Perlmutter, “The Law of ‘Leased Worker’ and Temporaiy Worker’ under a CGL Policy,” Tort Trial & Insurance Practice Law Jour., Vol. 45:3-4, p. 761, 763 n. 4, 764 (Spring/Summer 2010). The Massachusetts statutes and regulations allocating responsibility for securing workers’ compensation insurance do have an approximate analogue of the “loaned worker” and “temporary employee” concepts. In G.L.c. 152, §14A(l)(c), the following definition of “leasing company” appears:
(c) “Employee leasing company,” a sole proprietorship, partnership, corporation or other form of business entity whose business consists largely of leasing employees to one or more client companies under contractual arrangements that retain for such employee leasing companies a substantial portion of personnel management functions, such as payroll, direction and control of workers, and the right to hire and fire workers provided by the employee leasing company; provided, however, that the leasing arrangement is long term and not an arrangement to provide the client company temporaiy help services during seasonal or unusual conditions.
The statute also authorizes the Commissioner of Insurance to promulgate regulations establishing “the circumstances and conditions, if any, under which any employee leasing company may be the policyholder of a workers’ compensation insurance policy providing coverage to employees leased to client companies.” G.L.c. 152, §14A(2). The applicable regulation requires “the employee leasing company to purchase and maintain a separate policy providing standard workers’ compensation and employers’ liability insurance for each client company.” See The Home Ins. Co. v. Liberty Mutual Fire Ins. Co., 444 Mass. 599, 604-05 (2005). However, temporaiy employees may be excluded indirectly by implication from this obligation, since they are excluded from the definition of “employee leasing arrangement.’’[5] In this case, therefore, Dynamic Staffing might have claimed that it did not have to cover Ms. Sanchez for her assignment based upon short-term workload conditions, while at the same time, the facts show that True’s workers’ compensation insurer did, in fact, disclaim coverage.
The upshot of the statutoiy and regulatoiy scheme is likely to be confusion among employers, with the attendant possibility of either a gap in coverage or duplicative coverage. In the absence of policy language banning duplicative recovery, the mere fact of potential duplicate coverage from different insurers under different policies does not compel the conclusion that the exclusion applies if the facts, viewed in light of the policy language, lead to a different result. Cf. Golchin v. Liberty Mut. Ins. Co., 460 Mass. 222, 235 (2011). The parties do not cite any CGL policy provision that expressly allows or bars duplicative recoveiy. In the absence of any contextual guidepost, the Court looks primarily to the policy language itself.
C. The Policy Language
The Policy includes a “leased worker” in the definition of “employee.” It also excludes a “temporaiy worker” from the definition of “leased worker.” There is no dispute that Ms. Sanchez was a “leased worker” within the meaning of the Policy, unless she is excluded from that definition by reason of being a “temporary worker.” That question, in turn, depends upon whether she was furnished by a labor leasing firm (or other third party) to meet True’s “short-term workload conditions.” Dion, 65 Mass.App.Ct. at 49-50.
It is clear that Dynamic Staffing was a “labor leasing firm.” While it does not use the word “lease” in connection with, placement of its employees with a client company, the agreement described by paragraphs 7-17 of Mr. Howe’s affidavit (whose testimony I credit on this point) amounts to the same thing. Dynamic *221 hires the employees, who are placed with a client company to support the client’s workforce. As stated in Mr. Howe’s affidavit (id. and paragraphs 24-26), Dynamic retains substantial management functions regarding the employees, including payroll, hiring and firing, and direction and control.
There is also no doubt that Ms. Sanchez was “furnished” by a third party, here Dynamic Staffing. See Dion, 65 Mass.App.Ct. at 49-50 (“[t]he usual and ordinary sense of the words ‘furnished to you’ necessarily connotes some involvement by a third person”), quoting Superior Court decision. The matter appears without dispute, but in any event, I so find as a matter of fact.
“The phrase ‘furnished to meet’ [in the ‘temporary worker’ definition] suggests that the reasonable expectations of the parties concerning workload conditions, as measured at the time the employee is ‘furnished,’ governs whether the employee fits within either the ‘seasonal’ or ‘short-term’ category.’ ” Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 79 (1st Cir. 2009) (quoting District Court with approval in applying Massachusetts law), rev’g on other grounds, Scottsdale Ins. Co. v. Carrabassett Trading Co., Inc., 460 F.Sup.2d 251, 257 (D.Mass. 2009). I therefore evaluate the reasonable expectations of Dynamic Staffing and True concerning workload conditions at the time the services of Ms. Sanchez were furnished.
D. Furnishing Ms. Sanchez to Meet Short-term Workload Conditions.
“(A]mong the critical . . . factual issues” are “the nature of [True Plastic]’s workflow and how [Sanchez’s] placement fit within its ordinary course of business,” as well as the insured’s “intent in using” the worker. Scottsdale, 561 F.3d at 80. As found above, True Plastic’s workflow fluctuated significantly depending upon the receipt of orders. In that qualitative respect, the September 24 order from Flexhead was not unusual. On the other hand, by nearly a factor of three, no prior order from Flexhead had come remotely close to the size of the 4,000 units ordered on that date. At the time of that order, True was still in the process of completing orders from Raytheon and Sigma. In fact, despite hiring Ms. Sanchez, the Flexhead order outstripped True’s capacity to deliver the required quantify on time, resulting in the loss of Flexhead’s business despite a pre-existing customer-supplier relationship. Because this loss of business was clearly contrary to True’s desires and interests, it is perhaps the most persuasive and credible demonstration that there really had been a short-term increase in workload, not just a convenient recharacterization by the insured.[6] Coupled with the significant rise in leased worker hours in October and November — nearly the highest months of the year but still not enough to complete the order — the facts show that the very large Flexhead order did create a significant and unusual short-term increase in demand. That increase meets the policy language of “short-term workload conditions.”
Ms. Sanchez was furnished to meet that short-term workload condition. The timing of her hiring on September 27, 2004 was no coincidence. It occurred at precisely the time of need created by the Flexhead order, coming as it did just after receipt of the order, a few days before the raw materials arrived and just in time to receive the necessary training. I credit the testimony that she was hired to meet the demand created by the Flexhead order. Her placement within True’s ordinary course of business thus fits the requirement that she be hired to meet the short-term need, not just to meet long-term business requirements.[7]
Central Mutual argues that the phrase “short-term” cannot mean “indefinite” or “open ended.” I agree. However, in the CGL policy, that phrase modifies “workload conditions” not the temporary employee’s term of employment. The workload conditions resulting from the Flexhead order were indeed short term, as the need for an additional worker was expected to last for as long as it took to fill the order, approximately 6 to 7 weeks. That period is “relatively brief and relatively finite.” See Scottsdale, 460 F.Sup.2d at 258. See also 211 Code Mass. Regs. 111.03 (2011) (an employee leasing arrangement “is long term and not an arrangement to provide the lessee temporary help services during seasonal or unusual conditions such as temporary skill shortages or temporary special assignments and projects”).
It would therefore not be determinative even if, as Central argues, True and Dynamic Staffing understood that Ms. Sanchez’s “employment would be indefinite.” I reject the contentions of both parties that True and Dynamic Staffing had any expectation regarding the duration of Ms. Sanchez’s assignment, other than that, while she was furnished to meet the short-term workload conditions created by the Flexhead order, she would work for as long as needed.
There are good reasons why the Policy focuses on the short-term nature of the workload conditions, and relegates the expected duration of assignment to the role of a potentially relevant subsidiary fact.[8] There is usually no reason for the insured and the leasing agency to have any intention at all on the duration of assignment at the time the employee is first furnished. Like the parties in this case,[9] they are likely to understand that anything can happen and to expect that the employee will continue to work for the insured as long as there is a need, from whatever cause, even after the short-term workload requirements are finally met. Construing the Policy to exclude coverage because the insured and leasing agency did not intend a “short-term work assignment” would add an additional prerequisite (often in the nature of an unprovable impediment) to coverage and thereby defeat a reasonable insured’s understanding of “short-term workload conditions.” If the policy language is susceptible to a contrary interpretation, then the policy contains an ambiguity, which must be resolved against the ins *222 urer.[10] I have therefore looked to the workload conditions at the time Ms. Sanchez’s labor was furnished, not the anticipated length of her assignment.[11]
Much of Central’s argument focuses upon True’s business model, which includes frequent use of temporary employees from Dynamic Staffing and other temporary agencies. Central has shown the factual premise of its argument — that True indeed had such a business model and therefore hiring temporary employees was predictable and in no sense unexpected or unusual. However, the Policy’s language does not make coverage turn upon the insured’s mode of operation. Where Ms. Sanchez was in fact furnished to meet short-term workload conditions, the exception to the exclusion applies; that is to say, True has coverage for Ms. Sanchez’s accident.
CONCLUSION
For the above reasons, it is hereby ORDERED AND ADJUDGED:
1. Judgment shall enter for the defendant on the complaint;
2. The Court declares that Marciala Sanchez was furnished to True Plastics, Inc. to meet a short-term workload condition and therefore that the employer liability exclusion to the Central Mutual Insurance Company Commercial Policy Number CLP 7989942, effective January 1,2004 to January 1, 2005, does not apply to the injuries suffered by Ms. Sanchez on October 14,2004 on the premises ofTrue Plastics, Inc.
3. The Court declares that Central Mutual Insurance Company owes a duly to defend and indemnify True Plastics, Inc. under the terms and provisions of Policy Number CLP 7989942, effective January 1, 2004 to January 1, 2005 in connection with the action entitled Marciala Sanchez v. True Plastics, Inc., Worcester Superior Court, Civil Action Number WOCV2005-00899.

The parties’ stipulation is set forth verbatim, even though it uses different abbreviations than the main text of this decision.

See Plaintiffs Requests for Findings of Fact and Conclusions of Law and Entry of Declaratory Judgment, pp. 5-6, paragraphs 46-57.

Purchase orders #6764 (A. 416) and #6769 (A. 413), respectively. The record does not explain why some purchase orders appear in tab 11 of the exhibits, but not in tab 4, which Tme cites in detailing the history of the orders. The truth appears to be slightly less favorable than True’s portrayal, but True’s larger point is well-taken.

The Court has found both sides’ briefs extremely helpful and has consulted both briefs constantly during the writing of this decision.

Exercising its authority under G.L.c. 152, §14A(2) to promulgate regulations to supplement the statute, the Department of Insurance has promulgated the following definitions.
Employee leasing arrangement means an arrangement whereby one business entity provides workers to another business entity under a contract that retains for the lessor a substantial portion of personnel management functions, such as payroll, direction and control of workers, and the right to hire and fire those workers provided by such lessor; provided, however, that the leasing arrangement is long term and not an arrangement to provide the lessee temporary help services during seasonal or unusual conditions such as temporary skill shortages or temporary special assignments and projects.
Employee leasing company means a sole proprietorship, partnership, corporation or other form of business entity whose business consists largely of providing workers to one or more client companies by means of employee leasing arrangements.
211 CMR 111.03.

Although the loss of Flexhead’s business occurred well after Ms. Sanchez’s labor was furnished to True Plastics, it is evidence that True did not have the capacity to handle the workload required by the September 24 order at (and even after) the time the leased labor was furnished. Considering this fact as evidence of capacity at the relevant time therefore does not constitute retrospective analysis.

Central Mutual argues that there were already a number of other Dynamic Plastics employees working at True Plastics. That may be evidence that those employees were not hired to meet a short-term workload condition, but this case does not concern CGL coverage for those employees. The sole question is whether the injury to Ms. Sanchez is covered.

Of course, if the parties actually had an understanding regarding the duration of employment, that could be very important evidence of whether the workload conditions were or were not short term. An understanding that the duration was to be limited would strongly favor the former conclusion, while an understanding that employment would be indefinite — in the sense of not limited to a particular project — might be important evidence favoring the latter conclusion.

As found above, the parties understood that she would work until her services were no longer needed. The immediate need was the Flexhead order. They could not and did not make any prediction about subsequent events leading to the termination or continuation of her employment.

Certainty in interpreting an insurance policy is also desirable. Cf. Scottsdale, 460 F.Sup. at 257 n.3 (adopting a construction that has the “practical advantage” of allowing the parties to know when coverage exists). It would be self-defeating for the “leased employee” exclusion to depend upon unknowable facts and amorphous understandings on issues that the parties will generally not even consider until after the accident. Such a trigger would promote litigation in which self-serving testimony will likely require a trial. On the other hand, making the exemption depend upon the more objective facts concerning the short- or long-term nature of the workload conditions themselves at the time the employee is furnished leads to a more predictable and certain application.

In Scottsdale, 460 F.Sup.2d 251, 258-59, the District Court initially focused on the short- or long-term nature of the workload conditions, but then relied heavily upon the fact that “the parties intended that [the worker] work at [the insured] for an indefinite amount of time.” However, the First Circuit “part[ed] with company” with that analysis, reasoning that it did “not view [the worker’s] ‘indefinite’ placement as necessarily incompatible with the possibility that he was addressing a ‘short-term workload condition.’ ” Scottsdale, 561 F.3d at 79-80. To the extent that Central Mutual relies upon the District Court’s opinion on this point (see Plaintiffs Memo, p. 12), that opinion is not good law. The other authority cited by Central Mutual on this point is also not good law, because it relied upon the District Court’s Scottsdcúe opinion before the First Circuit’s reversal in 2009. Pacific Employers Ins. Co. v. Wausau Business Ins. Co., 2007 WL 2900452 at *7 (M.D.Fla. 2007).